**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DANIEL CAMEY and RAYMOND ALVANDI, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>FORCE FACTOR, LLC, a Massachusetts Limited Liability Company,<br><br>        Defendant. | Civil Action No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Daniel Camey and Raymond Alvandi ("Plaintiffs"), on behalf of themselves and all others similarly situated, alleges against Defendant Force Factor, LLC ("Force Factor" or the "Defendants") the following upon his own knowledge, or where there is no personal knowledge, upon information and belief and the investigation of his counsel:

**NATURE OF THE ACTION**

1.      This is a class action against Force Factor arising out of the sale of its "Test X180," line of testosterone boosting supplements, including, "Test X180," "Test X180 Ignite," and "Test X180 Alpha"  (collectively the "Test X180 Products").  Defendant markets the Test X180 Products as "groundbreaking" supplements designed to dramatically boost testosterone levels by as much as 99%.  As a result of this purported boost in testosterone, users of Test X180 Products will experience a variety of benefits, including the ability to increase lean muscle mass, burn fat, and "boost sex drive and libido."

1

2.      Furthermore, Defendant claims that Test X180 Products are based on "breakthrough" formulas "backed by real science."  In fact, Defendant boasts that all of the Test X180 Products contain "one of the only natural ingredients clinically demonstrated to increase free testosterone levels: Testofen."

3.      Defendant's representations, however, were materially false and misleading when made.  The Test X180 Products, and the proprietary blend of ingredients contained therein, do not significantly boost testosterone levels in men.  Nor do Test X180 Product increase lean muscle mass, burn fat, or boost one sex drive or libido.  In fact, clinical tests comparing the main active ingredients in the Test X180 Products fenugreek to placebos, found that the ingredient has no effect on testosterone levels.  At least two other studies have similarly shown that fenugreek extract has no effect on free testosterone levels.

4.      Defendant has materially misled thousands of consumers, including a significant number of men who are prone to normally decreasing testosterone levels, through a massive advertising campaign, including the internet.   Defendant's advertising involves numerous materially false and misleading statements concerning the Test X180 Products, which have injured Plaintiffs and the Class by inducing them to purchase worthless products.  As a result, Defendant should be held liable for their deceptive conduct in the marketing and sale of Test X180 Products.

5.      Plaintiffs seeks relief in this action individually, and as a class action on behalf of all persons in the United States, within the relevant statute of limitations period, who purchased the Test X180 Products for Defendant's violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.*, for breach of express warranty, for breach of implied warranty of merchantability, for unjust enrichment, and for violations of the Massachusetts

Consumer Protection Act, MASS. GEN. LAWS CH. 93A, the California Consumer Legal Remedies Act ("CLRA"), Civil Code § 1750, *et seq.*, Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, *et seq.*, and False Advertising Law ("FAL"), Bus. & Prof. Code § 17500, *et seq.*

## **PARTIES**

6.     Plaintiff Daniel Camey is a citizen of California.  Plaintiff viewed the various advertisements concerning the Test X180 Products prior to the time of purchase and understood them as a representation and warranty by Defendant that the Test X180 Products was "proven" to boost testosterone levels.  Moreover, that as a result of a purported boost in testosterone levels, TEST X180 Ignite would, among other things, "help increase lean muscle mass and jumpstart [his] energy, libido, and performance."  He relied on these representations and warranties in deciding to purchase the Test X180 Products, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Test X180 Products if he had known that it was not in fact, proven to boost testosterone levels and increase lean muscle mass, energy, libido, and performance.  On or about September 2013, Plaintiff purchased Test X180 Ignite from Amazon.com, for approximately $60.  Plaintiff used Test X180 Ignite pursuant to the instructions on its respective packaging, but Test X180 Ignite was not as advertised for the reasons provided herein.

7.     Plaintiff Raymond Alvandi is a citizen of California.  Plaintiff viewed the various advertisements concerning the Test X180 Products prior to the time of purchase and understood them as a representation and warranty by Defendant that the Test X180 Products was "proven" to boost testosterone levels.  Moreover, that as a result of a purported boost in testosterone levels, TEST X180 Ignite would, among other things, "help increase lean muscle mass and jumpstart [his] energy, libido, and performance."  He relied on these representations and warranties in

deciding to purchase the Test X180 Products, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Test X180 Products if he had known that it was not in fact, proven to boost testosterone levels and increase lean muscle mass, energy, libido, and performance.  Plaintiff Alvandi purchased Test X180 Ignite on or about January of 2014 from a GNC store near his home in Los Angeles, California for approximately $79.95.[1]  Plaintiff used Test X180 Ignite pursuant to the instructions on its respective packaging, but Test X180 Ignite was not as advertised for the reasons provided herein.

8.      Defendant Force Factor, LLC was a Massachusetts limited liability company that maintains its principal place of business at 24 School Street Ste. 301 in Boston, Massachusetts 02108.  Defendant is registered to do business in the Commonwealth of Massachusetts as entity number 800451990.  Force Factor, creates advertises, and sells a wide variety of supplements, including Factor 2. BRX, Ramp UP, Glutamine, Ketabolic Pro, Omega 3, Test X180 and Test X180 Ignite.  Defendant represents that the Company's "skyrocketing success is a testament to the quality and effectiveness of [its] supplements."  At all times relevant to this Complaint, acting individually or in concert with others, Defendant has marketed and sold Test X180 Products to consumers in the Commonwealth and throughout the United States.  Defendant offers the Test X180 Products for sale in the Commonwealth and nationwide on its own websites as well national retailers including GNC and Amazon.com.

**JURISDICTION AND VENUE**

9.      This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2), as amended by the Class Action Fairness Act of 2005, because the matter in controversy, exclusive

---

[1] Plaintiff Alvandi previously participated in a free trial/sample program and was subsequently and unknowingly enrolled in an "autoship" program, whereby Defendant automatically charged Plaintiff's credit card without his consent.  As a result of this improper conduct, Plaintiff Alvandi returned the product and received a refund related to this earlier purchase.

4

of interest and costs, exceeds the sum or value of $5,000,000, and is a class action where Plaintiffs and Class Members are from a different state than Defendant. Further, at least two thirds of the members of the class are citizens of a state different from Defendant.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs are residents of the State of California, Defendant resides in the state of Massachusetts, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

11.     In addition, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs are alleging that Defendant has violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

12.     Personal jurisdiction is derived from the fact that Defendant conducts business within the Commonwealth of Massachusetts and maintains its headquarters and principal place of business within the Commonwealth of Massachusetts.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) and (c) because a substantial part of the events and acts giving rise to the claims herein occurred in this District and Defendant principal place of business is located within this judicial district.

## FACTUAL BACKGROUND

### A.     Testosterone and Andropause

14.     Testosterone is the principal male sex hormone and an anabolic steroid. Testosterone plays a large role in the health and well-being of men by maintaining sperm production, sex drive, muscle mass, and bone density. It is the hormone that is primarily responsible for producing and maintaining the typical male characteristics such as body and

facial hair, muscle growth, and strength. Maintaining normal testosterone levels in elderly men has been shown to improve parameters which are thought to cause cardiovascular disease risk, such as increased lean body mass, and decreased cholesterol. Testosterone is also important for sustaining mental and physical energy.

15.     Testosterone is produced mostly in the testes and a small amount of testosterone is produced from steroids secreted by the outer layer of the adrenal glands, also known as the adrenal cortex.

16.     Testosterone primarily circulates in the blood of men in three types or forms. Most of the testosterone in the blood is bound to a protein called sex hormone binding globulin ("SHBG").  Testosterone is also bound to another protein called albumin. Testosterone that is not bound is considered "free."

17.     The body carefully controls the production and regulation of testosterone. Chemical signals from two locations - the pituitary gland at the base of the brain, and a part of the brain called the hypothalamus - tell the testes how much testosterone to produce. The hypothalamus controls hormone production in the pituitary gland by means of gonadotropinreleasing hormone ("GnRH").  This hormone tells the pituitary gland to make follicle stimulating hormone ("FSH") and luteinizing hormone ("LH"). LH signals the testes to produce testosterone.  If the testes begin producing too much testosterone, this is sensed by the brain which sends signals to the pituitary to make less LH.  This, in turn, slows the production of testosterone.   If the testes begin producing too little testosterone, the brain senses this and sends signals to the pituitary gland telling it to make more LH, which stimulates the testes to make more testosterone.

18.      Furthermore, as men age, their ability to produce total, free, and bioavailable testosterone (*i.e.*, not bound by SHBG) gradually declines.  This is due to a number of factors. For example, some men's production of LH decreases with aging, which lowers testosterone production.  Moreover, the protein that binds up and holds onto testosterone, SHBG, increases in older men.  This reduces the amount of free (or unbound) testosterone in the blood that is available to tissues, such as muscles.   Aging also causes changes in the daily cycle of testosterone production.  For example, younger men show a spike or peak of testosterone levels in the morning, but this peak is reduced in older men.

19.      "Andropause" is a term frequently used to describe this natural and subtle decline in testosterone production in men as they age.  The most common symptoms of andropause include diminished sexual desire and erectile quality, low fertility rates, fatigue, depression, anxiety, irritability, increased body fat, and loss of strength and muscle mass. Complications associated with andropause also include risk of cardiovascular problems and osteoporosis.

20.      It is estimated that the incidence of andropause in men from ages 50 to 59 is between 6% and 30%, with incidence increasing with age.

21.      According to a 2006 study published in the *International Journal of Clinical Practice*, as many as 13.8 million men older than 45 in the United States have low levels of testosterone.

22.      Medically diagnosed low testosterone levels are most often treated with a hormone replacement therapy, specifically testosterone replacement therapies ("TRT's"), which are prescribed to improve both physical and psychological functioning.

23.     TRT's regimens may only be conducted under the supervision of a licensed physician and require careful monitoring of hormone levels.  TRT can consist of various forms of the hormone using delivery systems including patches, gels, creams, injections, or pellets.

24.     TRT treatments, however, have a number of undesirable side effect and dangers. For example, prolonged use of any testosterone delivery system may result in breast enlargement or increased risk of prostate enlargement or cancer in older men. Additionally, patients with preexisting heart, kidney, or liver disease may experience fluid accumulation with or without heart failure. Moreover, men with breast cancer or known or suspected prostate cancer should not receive testosterone therapy at all as it may increase the risks associated with those conditions.

25.     Despite the risks, TRT treatments have seen a dramatic rise in use as the baby-boomer generation, which accounts for about 30% of the U.S. population, is beginning to feel the natural effects of low testosterone levels. In fact, treatments for low testosterone have exploded in the U.S., amounting to $1.6 billion in sales in 2011 alone according to data compiled by Bloomberg.  Sales are expected to triple to $5 billion by 2017, according to Global Industry Analyst, Inc.

**B.      Defendant Capitalizes On The Billion Dollar TRT Market**

26.     In an effort to capitalize on the booming TRT market, Defendant began to market the Test X180 Products as "groundbreaking" supplements designed to boost testosterone levels. Moreover, as a result of this purported increase in testosterone, users would experience "Heightened Libido, Enhanced Sexual Performance," "Strengthen Blood Flow," "Build Lean Muscle Mass," Maximize Power & Stamina," "Burn Fat and Build Muscle," "Boost Sex Drive & Libido," "Enhance Performance," and "Maximize Muscle Mass."

27.     Defendant primarily advertises and promotes Test X180 through uniform labeling claims on the front of the Product's packaging.  Label descriptions on the Product's packaging, taken as a whole, represent there are various benefits and characteristics to the Product including the ability to dramatically increase testosterone levels, burn fat, build muscle, boost sex drive and libido, and enhance performance.

28.     Defendant's Product is also the subject of an extensive and comprehensive advertising and marketing campaign in various media including the internet, through ESPN, CNN, Yahoo sports, SI.com, healthheadlines.com, and on the Defendant's own websites.

29.     Defendant advertises, distributes and sells the Test X180 Product directly to consumers online at www.forcefactor.com, www.testx180.com, and through nationwide retailers, including GNC stores.

30.     The Test X180 Products primarily consists of a proprietary blend of small amounts of extracts from seeds, herbs, roots, and other organic substances.  The main ingredient in the products is Testofen.

31.     In the marketing materials and on the product packaging and labeling, Defendant claims the fenugreek seed extract, Testofen, contained in all three of the Test X180 Products is "proven" and "clinically demonstrated" to increase free testosterone levels.   Defendant represents the purported increase in testosterone from Testofen also leads to a variety of additional benefits, including the ability to increase lean muscle mass, burn fat, and "boost sex drive and libido."

32.     Test X-180 is sold in a bottle containing 60 capsules for approximately $69.99 per bottle.   *See*  http://www.gnc.com/search/index.jsp?kwCatId=&kw=force%20factor&origkw=force%20factor&f=Taxonomy/GNC/13200328&sr=1 (last accessed December 22, 2014).

33.     Test X180 Ignite is sold in a bottle containing 120 capsules for around $79.99 per bottle.   *See* http://www.gnc.com/Force-Factor-Test-X180-IGNITE/product.jsp?productId=2393 3156 (last accessed December 22, 2014).

34.     Test X180 Alpha is sold in a bottle containing 120 capsules for around $114.99 per bottle.   *See* http://www.gnc.com/Force-Factor-Test-X180-ALPHA/product.jsp?productId= 16633956 (last accessed December 22, 2014).

### C.     False And Misleading Marketing of Test X180 Products

35.     Defendant has engaged in a massive, uniform marketing and advertising campaign designed to convince consumers that Test X180 Products naturally and dramatically boosts testosterone levels.   Defendant then disseminated materially false and misleading statements which represent, both expressly and by implication, that scientific clinical tests prove that Test X180 Products will dramatically boost testosterone levels.   These false and materially false and misleading statements were disseminated in a prolonged, multiplatform advertising and marketing campaign, designed to induce consumers to purchase Test X180 Products through the internet at the Company's own website and through national retailers such as GNC stores.

36.     For example, the front label of Text X180 (*Exh. A*) features the misleading sub-headings "Boost Sex Drive & Libido," "Enhance Performance," "All-in-One Male Vitality Supplement," and "Free Testosterone Booster and Fat Burner." The side label (*Exh. A*) further states that Test X180 is a "premium Male Performance Formula" and that "with Text X180, you can build bigger muscles," "increase your libido," and heighten "sexual appetite for a more satisfying love life." The label further boasts that the Test X180 Product is backed by real science by making claims such as:

- "The experts at Force Factor carefully formulated Test X180 … with premium, <u>clinically supported compounds like Testofen</u>;"

- "<u>The indgredients in our proprietary blend are substantiated with rigorous research and hard, scientific facts</u>;"

- "Each serving of Test X180 contains <u>clinically researched levels of Testofen®, the proven, natural fenugreek seed extract that has been shown to help men add pounds of hard, sculpted muscle to their bodies</u>;"

- "Testofen is the well-known, effective compound your body needs to combat natural testosterone decline;" and

- "<u>With no side effects, it will help you safely boost your testosterone levels</u>."

37.     Similarly, the side label of Test X180 states "Each serving of Test X180 contains clinically research levels of Testofen®, the proven, natural fenugreek seed extract that has been shown to help men add pounds of hard, sculpted muscle to their bodies.  Testofen is the well-known, effective compound your body needs to combat natural testosterone decline.  With no side effects it will help you safely boost your testosterone levels, your muscle mass, and your confidence."



38.     The front label of Test X180 Ignite (*Exh. B*) similary features the misleading sub-headings "Boost Sex Drive & Libido," "Enhance Performance," "All-in-One Male Vitality Supplement," and "Free Testosterone Booster and Fat Burner." The side label (*Exh. B*) further states that Test X180 Ignite will increase "libido and performance" and "increase their sex drive" suggesting that Test X180 Ignite's ingredients work as advertised, *i.e.,* as a testosterone booster and aphrodisiac.  In addition, the side label (*Exh. B*) states that "Test X180 Ignite was developed to be the ultimate all-in-one free testostorone booster, using safe, trusted ingredients backed by real science" and that "Test X180 Ignite is fuled by Testofen®, a natural fenugreek seed extract used by men worldwide.'  These claims were materially false and misleading when made for the reasons described herein.

39.     The label of Test X180 Alpha (*Exh. C*) also features the misleading sub-headings "Heighten Libido," "Enhance Sexual Performance," "Strenghten Blood Flow," "Builds Lean Muscle Mass," "Maximize Power & Stamina," and "The Prefered Testosterone Booster of Elite Men."  The Test X180 Alpha Product label (*Exh. C*) further states that "Alpha males don't settle

for mediocrity," and that "<u>Test X180 Alpha offers the complete solution for staggering virility,</u> <u>from dominating tough workouts in the gym to exceeding expectations in the bedroom</u>" suggesting that the ingredients in Test X180 work as advertised, *i.e.,* as a testosterone booster and aphrodisiac.  In addition, the Test X180 Alpha label (*Exh. C*) states that "<u>the Force Factor</u> <u>team perfected the Test X180 Alpha formula with one of the only natural ingredients clinically</u> <u>demonstrated to increase free testosterone levels: Testofen</u>" and that "<u>With Test X180 Alpha,</u> <u>you'll start to transform your physique and have better sex. End of story.</u>"  These claims are false and misleading for the reasons described herein

40.    Defendant also makes similar misrepresentations on its website regarding the benefits of the Test X180 Products as a testosterone booster.  For example, the Defendant's website with respect to Text X180 states:

> How do you safely increase testosterone levels? Well-researched ingredients are the answer, which is why the experts at Force Factor® formulated Test X180™ with premium, clinically supported compounds like Testofen®. There's no reason to take a chance on unsafe, sketchy supplements. The ingredients in our proprietary blend are substantiated with rigorous research and hard, scientific facts – the same smart science behind the entire line of Force Factor products.
>
> Testosterone boosters aren't just for pro bodybuilders; they are the answer for every guy who wants to challenge his declining testosterone and perform at the highest level. Ready to feel like a superhero in the gym and in the bedroom? With Test X180, you can finally achieve maximum muscle gains, mind-blowing performance, and the explosive results you've been craving.

http://www.forcefactor.com/products/test_x180 (last accessed December 22, 2014)

41.    Similarly, the Company's TestX180 Ignite website boasts the ability to boost testosterone levels, lean muscle mass, sex drive and libido.  Specifically, the website states:

**Test X180 Ignite** – Natural Testosterone Builder That Improves Your Muscle Mass!

Test X180 is a revolutionary product that boosts your testosterone levels, which has wide ranging benefits for men of all ages. Rock hard muscles and sculpted abs are not reserved just for bodybuilders, you too can see these amazing results by simply purchasing Test X180 Ignite. Not only will your body transform, but your virility and sex drive will also benefit greatly.

http://testx180ignite.com/ (last accessed December 22, 2014).

42. Similarly, the Company's TestX180 Alpha website boasts the ability to boost testosterone levels, "Heighten Libido," "Enhance Sexual Performance," "Strengthen Blood Flow," "Build Lean Muscle Mass," and "Maximize Power & Stamina."  Furthermore, that "the natural ingredient Testofen® is clinically demonstrated to raise your body's free testosterone levels for dramatic increases in libido, strength, and stamina." http://forcefactor.com/products/test_x180_alpha (last accessed December 22, 2014).

43. Furthermore, many of the advertisements feature photographs of or quotations of physically fit and/or professional athletes lauding the benefits of TestX180 Ignite.  A screenshot captured from Defendant's website featuring photographs of athletes and quotations from Vernon Davis, a professional NFL player are provided below:



http://testx180ignite.com/ (last accessed December 22, 2014)

44.     Defendant's website promoting a free trial of the Test X180 Products makes similar representations.   Secreenshots captured from Defendant's website featuring additional photographs and quotations from professional athlete Vernon Davis:



15





http://www.forcefactor.com/lg/15381/pid=180&aff_id= (last accessed December 22, 2014).

45.     Additionally, Defendant's materially false and misleading marketing campaign includes representations made on social media websites.  For example, on the Facebook profile for Test X180[2], Defendant states that Test X180 Ignite is "[t]he most advanced free testosterone booster yet."  The Facebook page also maintains numerous photos and representations that Test X180 is a "natural" testosterone booster with "clinically researched ingredients" that will "Boost free testosterone by 99%":

---

[2]    *See*,   https://www.facebook.com/pages/Test-180-Ignite/497345623687627   (last   visited December 22, 2014).



https://www.facebook.com/497345623687627/photos/pb.497345623687627.-
2207520000.1416242283./502468336508689/?type=1&theater (last visited December 22, 2014)

46.    Defendant makes similar misleading representations in video advertisements and

commercials, stating Test X180 Ignite will dramatically increase free testosterone by 96%:



http://www.youtube.com/watch?v=sfXVMiYrcFg&index=2&list=UUYZPWYeZA4GJTeGf3xg

HmHw (last visited December 22, 2014).

<u>PURPORTED "RIGOROUS" CLINICAL RESEARCH</u>

47.    Moreover, Defendant represents Test X180 Products are "backed by real science"
and "substantiated with rigorous research and hard scientific facts" to boost testosterone levels
and to boost sex drive and libido, and are effective for their intended use.   For example,
Defendant claims the "Test X180 line was developed by Harvard grads using proven scientific
methods."  Furthermore, that Testofen, the purported active ingredient in TEST X 180 Product is
"clinically researched" and has been shown to "help men add hard, sculpted muscle to their
bodies and boost their libido by increasing free testosterone safely and effectively."   While they
do not specifically identify any studies or universities, Defendants use ornate graphics on their
website to bolster their scientific claims:



http://www.testx180.com/science (last visited December 22, 2014).

48.    Furthermore, Defendant boasts about the "clinically researched" ingredients.   A
screenshot captured from Defendant's website is provided below:

18



http://www.testx180.com/science (last visited December 22, 2014).

49.     The Company also maintains a section on its website titled "Test X180 Ignite-Does it Really Work?" reinforcing the misrepresentation that TestX180 Products are "clinically proven":

> If you are looking to boost your testosterone naturally using a clinically proven safe method, you should try <u>Test X180 Ignite</u>. This testosterone booster works quickly to make you not only feel younger, but also help your body work more efficiently at creating muscle mass. This product will help you make the most out of your workouts and even allow your body to recover at record rates.

> This product is completely safe and studies show that no side effects are caused by use of this testosterone booster. <u>Test X180 Ignite</u> is created using a formula that was expertly crafted to yield real results for all users.

http://testx180ignite.com (last visited December 22, 2014).

50.     Similarly, Defendant's have set up and sponsored a multitude of affiliated websites boasting that TestX180 Products and the ingredients contained therein are purported backed by significant funding and "years" of scientific research.   For example, www.healthheadlines.com states:

Introducing Testofen, After years of research and millions of dollars spent, scientists agree that this game-changing ingredient formulated from a natural fenugreek seed extract is the best way to boost free testosterone and get an insane boost in libido.  We've tested it personally and believe us; it's worth the hype.

http://healthheadlines.com (last visited December 22, 2014).

51.    Additionally, Defendant's marketing materials contain numerous testimonials and/or "before and after" photos to bolster their claims.  None of the advertisements, however, disclose whether the results are typical.  For example, a screenshot captured from Defendant's websites are provided below:



http://testx180ignite.com (last visited December 22, 2014).



http://testx180ignite.org (last visited December 22, 2014).

52.     The Test X180 Products, however, do not work as testosterone boosters or as aphrodisiacs and the express claims of increased muscle mass and sexual performance enhancement were *per se* materially false and misleading when made.

### The Test X180 Products Do Not Boost Testosterone Levels

53.     Testofen® is the active ingredient in "Test X180," "Test X180 Ignite," and "Test X180 Alpha" that purportedly increases testosterone levels in the human male and thereby will "boost sex drive and libido," "enhance performance," and increase "lean muscle mass."

54.      Testofen® is "a natural fenugreek seed extract."

55.     Fenugreek seed extract has no ability to boost testosterone levels or increase sex drive in the human male. In fact, a study titled *Fenugreek Extract Supplementation Has No effect on the Hormonal Profile of Resistance Trained Males* concluded that "supplementation of fenugreek extract does not appear to affect hormonal status in resistance trained males and shows no anabolic potential as has been purported."[3]

56.     Further, a human clinical trial that compared Testofen® to Placebo found that Testofen® has no effect on testosterone levels.[4] At least two other studies have similarly shown that fenugreek extract has no effect on free testosterone levels.[5]

---

[3] B. Brandon *et al.*, (2009) "Fenugreek Extract Supplementation Has No effect on the Hormonal Profile of Resistance-Trained Males," *International Journal of Exercise Science: Conference Proceedings*: Vol. 2: Iss. 1, Article 13, *available at* http://digitalcommons.wku.edu /ijesab/vol2/iss1/13

[4] E. Steels, et al., (2011) Physiological Aspects of Male Libido Enhanced by Standardized Trigonella foenum-graecum Extract and Mineral Formulation, *Phytotheropy Res*.

[5] *See, e.g.,* C. Poole, *et al.*, (2009) Effects of TESTOSURGE supplementation on strength, body composition and hormonal profiles during an 8-week resistance training program, *Journal of International Society Sports Nutrition*; C. Poole *et al.*, (2010), the effects of commercially available botanical supplementation on strength, body composition, power output, and hormonal profiles in resistance-trained males, *Journal of International Society Sports Nutrition.*

57.    Neither is Testofen® effective at boosting a user's sex drive or libido or increasing lean muscle mass as claimed in Defendant's various advertisements and on the packaging on Test X180 Products.

58.    Moreover, there is no credible scientific evidence or studies showing that any other ingredient in the Test X180 Products— including but not limited to Horney Goat Weed Extract, Green Tea Leaf Extract, Avena Sativa Extract, Green Coffee Extract, and White Tea Extract — are "clinically proven" to increase testosterone levels, increase lean muscle mass, or boost a user's sex drive, sexual performance and/or libido.

59.    Moreover, the FDA considers labeling claims on sexual enhancement products ("aphrodisiacs") containing plant extracts, such as those in the Test X180 Products, to be either "false, misleading, or unsupported by scientific data." 21 C.F.R. § 310.528.

**The Test X180 Products' Aphrodisiac Claims Are Unlawful**

60.    The labeling described herein, including but not limited to: "Boost Sex Drive and Libido," "Enhance Performance," "All-in-One Male Vitality Supplement," and "heightens sexual appetite for a more satisfying love life" alone and in context with other express and implied labeling claims evidence Defendant's intended use of the Test X180 Products as aphrodisiacs, to arouse or increase sexual desire or improve sexual performance.

61.    Pursuant to Title 21 of the Code of Federal Regulations, Part 310.528 (21 CFR § 310.528) any over the counter ("OTC") drug product that is labeled, represented, or promoted for use as an aphrodisiac, like the Test X180 Products, is regarded as a "new drug" within the meaning of section 201(p) of the FDCA (located at 21 U.S.C. § 355(p)).

62.    The FDCA requires any new drug to have an application approved by the Food and Drug Administration ("FDA") before the drug can be marketed to the public, and further that

the drug's label be approved by the FDA prior to marketing or selling the drug to the public.  *See generally*, *id.*; 21 U.S.C. §§ 355(a), (b) [New Drug Application], (j) [Abbreviated New Drug Application, for generic drugs].

63.     The Test X180 Products violate Section 505(a) of the FDCA because the adequacy of the labeled directions for there "aphrodisiac" uses has not been approved by the FDA prior to the Products being marketed to the public (*see* 21 U.S.C. § 355(a)).[6]  Accordingly, the Products are misbranded under section 502(f)(1) of the FDCA (located at 21 U.S.C. § 352).

64.     Further, as to all of the ingredients in the Test X180 Products, there is a lack of adequate data to establish general recognition of the safety and effectiveness of any of these ingredients, or any other ingredient, for OTC use as an aphrodisiac.  21 C.F.R. § 310.528. Labeling claims for aphrodisiacs for OTC use are either false, misleading, and unsupported by scientific data.  *Id.*  Thus, based on the evidence currently available, any OTC drug product containing ingredients for use as an aphrodisiac, including the Test X180 Products, cannot be generally recognized as safe and effective.  *See id.*

65.     California Health and Safety Code, Division 104, Part 5, contains the Sherman Food, Drug, and Cosmetic Law ("Sherman Law," located at Cal. Health & Safety Code §§ 109875-111915).  The Sherman Law is explicitly authorized by the FDCA.  21 U.S.C. § 343-1.

66.     The Sherman Law defines a "drug" as "any article other than food, that is used or intended to affect the structure or any function of the body of human beings or any other animal [emphasis added]."  Cal. Health & Safety Code § 109925(c).

---

[6] In addition to proving effectiveness, the manufacturer of a new drug must also prove the drug's safety, sufficient to meet FDA standards.  21 U.S.C. § 355(d).

67.     Test X180 Products are with structure and function claims making them unapproved new drugs that is accordingly misbranded under the California Sherman Law.  Cal. Health & Safety Code §§ 110100, 110105, 110110, 110111.

68.     Defendant's marketing and promotion of the Text X180 Products was supported by false and misleading claims containing material omissions and misrepresentations and are in this respect misbranded under identical California and federal laws.

69.     When purchasing the Products, Plaintiffs and the class were seeking products that would provide the benefits, and possessed the efficacy and characteristics, as Defendant marketed, promised, represented and warranted.

70.     Plaintiffs and the class purchased the Test X180 Products believing they had the qualities they sought, based on the Products' deceptive labeling and marketing, but the Products were actually unacceptable to them as they did not possess the benefits, efficacy, and characteristics advertised.

71.     In purchasing the Test X180 Products, Plaintiffs and members of the putative class reasonably relied upon the various representations Defendant made on the Products' packaging and its prevalent advertising campaign, including online advertising, as described herein.

72.     At all times relevant herein, Defendant had a duty to disclose additional and/or complete, accurate information to purchasing consumers, to correct all misunderstandings its omissions and misrepresentations created in the minds of those consumers.

73.     Absent the misrepresentations and omissions described herein, which were and are material to the average consumer, Plaintiffs and class members would not have purchased the Product.

74.     When purchasing the Test X180 Products, Plaintiffs and Class members were seeking products that would provide the benefits and had the endorsements, proof of efficacy, and characteristics that Defendant's Products marketed, promised, represented and warranted.

75.     Plaintiffs and Class members purchased the Test X180 Products believing they had the qualities represented on the Product's labeling, but the Products were actually unacceptable to them, as they did not possess the benefits, endorsements, proof, and characteristics as advertised.

76.     Moreover, like all reasonable consumers and members of the Class, Plaintiffs considered a label's compliance with federal law a material factor in his purchasing decisions. Plaintiffs are generally aware the federal government carefully regulates OTC products and therefore has come to trust that information conveyed on packaged OTC product labels is truthful, accurate, complete, and fully in accordance and compliance with the law.  As a result, Plaintiffs and the Class trust they can compare competing products on the basis of their labeling claims in order to make a purchasing decision.

77.     Like all reasonable consumers and members of the Class, Plaintiffs would not purchase an OTC product they knew was misbranded under federal law, *see* 21 U.S.C. § 352, which the federal government prohibits selling, *id*. § 331, and which carries with its sale criminal penalties, *id*. § 333.  *See also* Cal. Health & Safety Code §§ 110100, 110105, 110110, 110111. Plaintiffs did not know, and had no reason to know, that Defendant's Test X180 Products were misbranded.

78.     Thus, Defendant was promoting the Test X180 Products in violation of the FDCA, making the Products misbranded under California's Sherman Law.  Misbranded products cannot be legally sold and are legally worthless.

79.     Similarly, like all reasonable consumers and Class members, Plaintiffs would not have purchased an OTC product they knew was an illegally marketed new drug for which the FDA has not determined its safety and efficacy.  In light of the foregoing, reasonable consumers, including Plaintiffs and other Class members, were and are likely to be deceived by Defendant's advertising and marketing practices as detailed herein.

80.     Plaintiffs and the Class will be exposed to the Test X180 Products false, deceptive, and unlawful labeling claims in the future when they visit retail stores for male sexual enhancement products and testosterone boosters unless Defendant agrees, or is enjoined, to change the Products' labeling in response to Plaintiffs' claims as set forth herein and in Plaintiffs' CLRA notice letters.

81.     Instead of receiving a product that had the benefits, advantages, endorsements, proof, and characteristics as advertised, Plaintiffs and other Class members received worthless products, as the Test X180 Products do not work; causes no effect or effects reverse of that advertised; and did not possess the characteristics, benefits, endorsements, and proof of efficacy, as advertised by Defendant.

82.     At all times relevant herein, Defendant had a duty to disclose additional information to purchasing consumers, to correct all misunderstandings their omissions and misrepresentations created in the minds of those consumers.

83.     Absent the misrepresentations and omission described herein, which were and are material to an average consumer, Plaintiff and other consumers would not have purchased the Products.

84.     Plaintiffs and the Class lost money as a result of Defendant's deception in that Plaintiffs and the Class did not receive what they had paid for.

85.     Plaintiffs and the Class altered their position to their detriment and suffered damages in an amount equal to the amount they paid for the Test X180 Products over the relevant statute of limitations period.

### Defendants' False and Misleading Claims are Material

86.     The representations at issue are ubiquitous.  In commercial videos, in retail stores, on their respective internet websites, and on Defendant's website, Defendant makes the same representations about the Test X180 Products, namely that the product is an effective testosterone booster and that the claims were backed by clinical studies and/or research. Moreover, every package of the product contains these representations.

87.     All of Defendant's claims challenged herein relate to matters that are material and important to a consumer's purchasing decision, as they concern core claims about the product which are likely to and did influence consumers' purchase of the Test X180 Products.

88.     Defendants' marketing, advertising, and packaging materials intended to, and did, induce Plaintiffs and members of the Class to rely upon Defendants' representations that the Test X180 Products were effective for its intended use and in the way described.   These representations were a substantial factor in causing Plaintiffs and members of the Class to purchase the Test X180 Products instead of an effective testosterone booster.

89.     At the time Plaintiffs and members of the Class purchased the Test X180 Products, they were unaware of the fact that:  (1) Defendant's claims that the Test X180 Products could boost testosterone levels are bogus; and (2) Testx180 Products are not proven effective for their intended use.

90.     If Plaintiffs and members of the Class had been aware of the true facts concerning the Test X180 Products, Plaintiffs and members of the Class would not have purchased the

products.  Plaintiffs and members of the Class have been injured in fact and have suffered out of

pocket losses.  Plaintiffs and members of the Class therefore seek a refund and/or rescission of

the transaction and all further equitable and injunctive relief as provided by applicable law.

## CLASS ACTION ALLEGATIONS

91.     Pursuant to Rules 23(a), (b)(3) and/or (b)(2) of the Federal Rules of Civil

Procedure, Plaintiffs bring this action on behalf of himself and a nationwide consumer class (the

"Class") initially defined as follows:

> All persons in the United States, who within the relevant statute of limitations
> period, purchased the Test X180 Products, for personal or household use and not
> for resale.  Excluded from the Class are governmental entities, the Defendant, any
> entity in which the Defendant has a controlling interest, its employees, officers,
> directors, legal representatives, heirs, successors and wholly or partly owned
> subsidiaries or affiliated companies, including parent corporations, class counsel
> and their employees; and the judicial officers and their immediate family
> members and associated court staff assigned to this case.

92.     Pursuant to Rules 23(a), (b)(3) and/or (b)(2) of the Federal Rules of Civil

Procedure, Plaintiffs bring this action on behalf of themselves and a sub-class[7] of California

consumers (the "California Sub-class") initially defined as follows:

> All persons in the State of California, who within the relevant statute of
> limitations period, purchased the Test X180 Products, for personal or household
> use and not for resale.  Excluded from the California Sub-class are governmental
> entities, the Defendant, any entity in which the Defendant has a controlling
> interest, its employees, officers, directors, legal representatives, heirs, successors
> and wholly or partly owned subsidiaries or affiliated companies, including parent
> corporations, class counsel and their employees; and the judicial officers and their
> immediate family members and associated court staff assigned to this case.

93.     The proposed Classes are so numerous that individual joinder of all their members

is impracticable.  Due to the nature of the trade and commerce involved, Plaintiffs believe the

total number of Class members is at least in the tens of thousands of persons in the United States,

---

[7] Plaintiffs reserve the right to amend all lass and Subclass definitions at class certification based
on additional research, factual investigations, discovery, and/or changes in federal or state law.

including in the Commonwealth of Massachusetts and the State of California. While the exact

number and identities of the Class members are unknown at this time, such information can be

ascertained through appropriate investigation, discovery or Class definition. The disposition of

the claims of the Class members in a single class action will provide substantial benefits to all

parties and to the Court.

94.     Pursuant to Rule 23(b)(2), Defendant has acted or refused to act on grounds

generally applicable to the Classes, thereby making final injunctive relief or corresponding

declaratory relief and damages as to its Product appropriate with respect to the Classes as a

whole. Retrospective injunctive relief would seek a recall of the Product's false, deceptive and

unlawful labeling and benefit the Classes equally as a whole. Prospective injunctive relief would

ensure that Class members are only exposed to lawful, truthful and non-misleading advertising of

the Products in the future[8], which will also benefit each member of the Classes in equal but

indivisible measure. In particular, Defendant has misrepresented or failed to disclose the true

nature of its Products being marketed and distributed, as detailed herein, through

misrepresentations and omissions on the labeling, by which Defendant acted and refused to act

on grounds generally applicable to the Classes as a whole.

95.     There is a well-defined community of interest in the questions of law and fact

involved affecting Plaintiffs and the Classes and these common questions of fact and law

include, but are not limited to, the following:

a.     Whether Defendant violated the Magnuson-Moss Warranty Act, 15 U.S.C. §

2301, *et seq.*;

---

[8] This is particularly applicable as Plaintiffs would be interested in purchasing the Test X180 Products in the future if Defendant corrected the Products and the misrepresentations became true.

b.      Whether Defendant breached any express warranties made to Plaintiffs and the Class;

c.      Whether Defendant breached an implied warranty of merchantability made to Plaintiffs and the Class;

d.      Whether Defendant was unjustly enriched by its conduct;

e.      Whether the claims discussed above are true, misleading, or reasonably likely to deceive an average consumer:

f.      Whether Defendant's alleged conduct violates public policy;

g.      Whether the alleged conduct constitutes violations of the laws asserted herein;

h.      Whether Plaintiffs and class members are entitled to declaratory and injunctive relief;

i.      The method of calculation and amount of restitution or damages to the Classes;

j.      Whether the Test X180 Products are effective at boosting testosterone;

k.      Whether the Test X180 Products are effective at increasing sex drive and libido;

l.      Whether the Test X180 Products are "backed by real science."

96.      Plaintiffs' claims are typical of the Class members' claims.  Plaintiffs and all Class members have been similarly affected by the Defendant's common course of conduct because they all relied on Defendant's representations concerning Test X180 Products and purchased the Test X180 Products based on those representations.

97.      Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have retained counsel with substantial experience in handling complex class action litigation in general and scientific claims. Plaintiffs and their counsel are committed to

vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

98.     Plaintiffs and Class members suffered and will continue to suffer harm as a result of Defendant's unlawful and wrongful conduct.   A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.   Individual joinder of all Class members is impracticable.   Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.   Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and efficient handling of all Class members' claims in a single forum.   The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of Class members.   Furthermore, for many if not most, a class action is the only feasible mechanism that allows an opportunity for legal redress and justice.

99.     Adjudication of individual Class members' claims with respect to the Defendant would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other class members to protect their interests.

**COUNT I**

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, *et seq.*)**
**(By the Nationwide Class)**

100.    Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

101.    Plaintiffs bring this Count I individually and on behalf of the members of the Nationwide Class, against Defendant.

102.    The Test X180 Products are consumer products as defined in 15 U.S.C. § 2301(1).

103.    The Test X180 Products are sold at retail for more than twenty five dollars.

104.    Plaintiffs and Class members are consumers as defined in 15 U.S.C. § 2301(3).

105.    Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301 (4) and (5).

106.    In connection with the sale of the Test X180 Products, Defendant issued written warranties as defined in 15 U.S.C. § 2301 (6), which warranted that the Test X180 Products would boost testosterone levels, boost sex drive and libido, and is effective for the Products' intended use. Moreover, Defendant claimed that by using the Test X180 Products a user could "Burn Fat and Build Muscle."

107.    Defendant breached these warranties because the Test X180 Products are not effective for their intended use and have never been proven effective by competent and reliable scientific evidence to boost testosterone levels or boost sex drive and libido.

108.    Plaintiffs provided notice of Defendant's breach of warranties prior to filing suit (*Exh. D*).

109.    By reason of Defendant's breach of the express written warranties, Defendant violated the statutory rights owed to Plaintiffs and Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, thereby damaging Plaintiffs and Class members.

110.    Plaintiffs and Class members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Test X180 Products if the true facts had been known.

## COUNT II

## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
### (Mass. Gen. Laws ch. 93A )
### (By the Nationwide Class)

111.    Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

112.    Plaintiffs bring this Count II individually and on behalf of the members of the Nationwide Class, against Defendant.

113.    Plaintiffs and the Class are persons.

114.    Defendant was engaged in trade or commerce.

115.    Plaintiffs and the Class entered into consumer transactions with Defendant.

116.    Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, in the conduct of trade or commerce.

117.    Defendant's acts, practices, and conduct were willful and knowing violations and invaded the rights of Plaintiffs and the Class to be free from deceptive business practices.

118.    More than thirty days prior to filing the initial Complaint, Plaintiffs made a written demand for relief from Defendant (*Exh.* D).

119.    As a proximate and foreseeable consequence of Defendant's violations, Plaintiffs and the Class sustained damages.

## COUNT III

### BREACH OF EXPRESS WARRANTY
### (By the Nationwide Class)

120.    Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

121.    Plaintiffs bring this Count III individually and on behalf of the members of the Nationwide Class, against Defendant.

122.    In connection with the sale of the Test X180 Products, Defendant expressly warranted by affirmation of fact or promise that the Test X180 Products would boost testosterone levels, boost sex drive and libido, and are effective for the Products' intended use. Moreover, Defendant claimed that by using the Test X180 Products a user could "Burn Fat and Build Muscle."

123.    Defendant's express warranties as described herein were made part of the basis of the bargain when Plaintiffs and the Class members purchased the Test X180 Products.

124.    The Test X180 Products are not effective for their intended use and have never been proven effective by competent and reliable scientific evidence to dramatically boost testosterone levels.

125.    Plaintiffs and Class members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Test X180 Products if the true facts had been known.

126.     Defendant breached its express warranty by selling a product that is not effective for its intended use and has never been proven effective by competent and reliable scientific evidence to dramatically boost testosterone levels.

## COUNT IV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (By the Nationwide Class)

127.     Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

128.     Plaintiffs bring this Count IV individually and on behalf of the members of the Nationwide Class, against Defendant.

129.     Defendant, as the designer, manufacturer, marketer, distributor, and seller impliedly warranted that the Test X180 Products were fit for their intend purpose in that the Test X180 Products would function as effective testosterone boosters. Defendant did so with the intent to induce Plaintiffs and members of the Class to purchase the products.

130.     Defendant breached its implied warranties in the contract for the sale of the Test X180 Products in that the Test X180 Products are not, and do not contain ingredients, that will boost testosterone levels and therefore could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the good were unfit for their intended and ordinary purpose because there is no competent and reliable scientific evidence that the Test X180 Products possess testosterone boosting qualities. As a result, Plaintiffs and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

131.   In reliance upon Defendant's skill and judgment and the implied warranties discussed above, Plaintiffs and Class members purchased the Test X180 Products for use as a testosterone booster.

132.   The Test X180 Products were not altered by Plaintiffs and the Class members.

133.   The Test X180 Products were defective when they left the exclusive control of Defendant.

134.   Defendant knew that the Test X180 Products would be purchased and used without additional testing for efficacy by Plaintiffs and Class members.

135.   The Test X180 Products were defectively designed and unfit for its intended purpose, and Plaintiffs did not receive the goods as warranted. Had Plaintiffs and the members of the Class known the true facts, they would not have purchased the Test X180 Products.

136.   Plaintiffs and Class members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Test X180 Products if the true facts had been known.

## COUNT V

### UNJUST ENRICHMENT
### (By the Nationwide Class)

137.   Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

138.   Plaintiffs bring this Count V individually and on behalf of the members of the Nationwide Class, against Defendant.

139.   Defendant's practices described above resulted in Plaintiffs and the Class to purchase Defendant's Test X180 Products.

36

140. The monies paid by Plaintiffs and the Class to Defendant conferred substantial benefits upon Defendant.

141. Defendant knew of the benefits conferred upon them by Plaintiffs and the Class.

142. Defendant appreciates the benefits conferred upon it by Plaintiffs and the Class.

143. Defendant accepted the benefits conferred upon it by Plaintiffs and the Class.

144. Defendant retained the benefits conferred upon it by Plaintiffs and the Class.

145. By reason thereof, Defendant was unjustly enriched.

146. Plaintiffs and the Class sustained damages.

## COUNT VI

### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, UNLAWFUL PRONG
### (Cal. Bus. & Prof. Code § 17200 *et seq.*)
### (By the California Sub-Class)

147. Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

148. Plaintiffs bring this Count VI individually and on behalf of the members of the California Sub-Class, against Defendant.

149. California Business and Professional Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

150. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "unlawful" business acts and practices in that Defendant's conduct violates the False Advertising Law, and the Consumer Legal Remedies Act.

151. Defendant's conduct is further "unlawful" because it violates the FDCA and its implementing regulations in the following ways:

a.  Defendant's deceptive statements violate 21 U.S.C. §§ 343(a) and 352, which deem a food or drug (including nutritional supplements) misbranded when the label contains a statement that is "false or misleading in any particular";

b.  Defendant's deceptive statements violate 21 C.F.R. § 101.14(b)(3)(i), which mandates "substances" in dietary supplements consumed must contribute and retain "nutritive value," as defined under 21 C.F.R. § 101.14(a)(2)(3) when consumed at levels necessary to justify a claim;

c.  Defendant's deceptive statements are *per se* false and misleading because the FDA has ruled there is a lack of adequate data to establish general recognition of the safety and effectiveness of any of the ingredients in the Test X180 Products, or any other ingredient, for OTC use as an aphrodisiac; and labeling claims for aphrodisiacs for OTC use are "either false, misleading, or unsupported by scientific data." 21 C.F.R. § 310.528(a);

d.  Defendant's deceptive statements violate 21 CFR § 310.528(b), which mandates that any OTC product that is labeled, represented, or promoted for use as an aphrodisiac, like Test X180 Products, is regarded as a "new drug" within the meaning of 21 U.S.C. § 355(p), but Defendant does not have new drug approval for Test X180 Products or there labeling, as required under the FDCA and its implementing regulations. Accordingly, Defendant's Products are misbranded under section 502(f)(1) of the FDCA;

e.  Defendant's Products also violates the FDCA because, as an unapproved new drugs and aphrodisiacs, the Test X180 Products cannot be generally recognized as

safe and effective in the absence of a new drug application as set forth in the FDCA and its implementing regulations. 21 C.F.R. § 310.528(a);

152.    Defendant's conduct is further "unlawful" because it violates the California Sherman Food, Drug, and Cosmetic Law, *see* Cal. Health & Safety Code § 109875-111900, which incorporates the provisions of the FDCA. *See id.* §§ 110110-110115.

153.    In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

## COUNT VII

## VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, UNFAIR AND FRAUDULENT PRONGS
### (Cal. Bus. & Prof. Code § 17200 *et seq.*)
### (By the California Sub-Class)

154.    Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

155.    Plaintiffs bring this Count VII individually and on behalf of the members of the California Sub-Class, against Defendant.

156.    California Business and Professional Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

157.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein also constitute "unfair" business acts and practices under the UCL in that Defendant's conduct is immoral, unscrupulous, and offends public policy by seeking to profit from male vulnerability to false or deceptive virility or aphrodisiac claims. Further, the gravity of Defendant's conduct outweighs any conceivable benefit of such conduct.

158.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "fraudulent" business acts and practices under the UCL in that Defendant's claims are false, misleading, and have a tendency to deceive the Class and the general public, as detailed herein.

159.    In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

160.    Plaintiffs further seek an order for the disgorgement and restitution of all monies from the sale of the Defendant's Products, which were acquired through acts of unlawful, unfair, and/or fraudulent competition.

## COUNT VIII

### VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW
(Cal. Bus. & Prof. Code § 17500 *et seq.*)
(By the California Sub-Class)

161.    Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

162.    Plaintiffs bring this Count III individually and on behalf of the members of the California Sub-Class, against Defendant.

163.    In violation of California Business and Professional Code § 17500 *et seq*., the advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and use of the Test X180 Products.

164.    Defendant knew and reasonably should have known that the labels on Defendant's Product were untrue and/or misleading.

165.    As a result, Plaintiffs, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

## COUNT IX

### VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT
### (Cal. Civ. Code § 1750 *et seq.*)
### (By the California Sub-Class)

166.    Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

167.    Plaintiffs bring this Count IX individually and on behalf of the members of the California Sub-Class, against Defendant.

168.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

169.    Defendant's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of Defendant's Product for personal, family, or household purposes by Plaintiffs and class members, and violated and continue to violate the following sections of the CLRA:

a.    § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.      § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

170.    As a result, Plaintiffs and the Class have suffered irreparable harm and seek injunctive relief under the CLRA.

171.    Pursuant to section 1782 *et seq*. of the CLRA, Plaintiffs notified Defendant in writing by certified mail of the particular violations of § 1770 of the Act as to the Product and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act (*Exh.* D). Defendant's wrongful business practices regarding the product constituted, and constitute, a continuing course of conduct in violation of the CLRA since Defendant is still representing that the Test X180 Products have characteristics, uses, benefits, and abilities which are false and misleading, and have injured Plaintiffs and the Class.

172.    Because Defendant failed to implement remedial measures, Plaintiffs seek actual damages, punitive damages, and attorneys' fees and costs for their CLRA claim.

## COUNT X

**BREACH OF CALIFORNIA'S SONG-BEVERLY CONSUMER WARRANTY ACT**
**(Cal. Civ. Code § 1790 *et seq*.)**
**(By the California Sub-Class)**

173.    Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

174.    Plaintiffs bring this Count X individually and on behalf of the members of the California Sub-Class, against Defendant.

175.    The Product is a consumer good because it is for personal, family or household purposes, and was purchased at retail sale by Plaintiffs and the Class from Defendant.  *See* Cal. Civ. Code §§ 1791, 1792.

176.    The Product is intended for human consumption.  *See Klein v. Duchess Sandwich Co.*, 14 Cal. 2d 272, 276-84, 93 P.2d 799 (1939); *Gottsdanker v. Cutter Labs.*, 182 Cal. App. 2d 602, 606-07, 6 Cal. Rptr. 320 (1960).

177.    Defendant is a merchant or retailers with respect to the goods sold.  Cal. Civ. Code §§ 1792, 1791.1(a).

178.    The warranty was breached because the Test X180 Products were not reasonably fit for the ordinary purposes for which such goods are used, or the Products did not reasonably conform to the promises or affirmations of fact on the container or label.  CACI 1230, 1231, 1232, 1233; *see also* Cal. Civ. Code §§ 1792, 1791.1(a)

179.    Defendant's breach of warranty caused Plaintiffs and the Class to suffer damage in the amount of the total purchase price of the Test X180 Products.

180.    In addition to compensatory damages, Cal. Civ. Code § 1794, Plaintiffs and the Class are entitled to rescission, *id.* § 1794(b)(1), costs, attorneys' fees and statutory penalties, *id.* § 1794(c).

## COUNT XI

## VIOLATIONS OF THE CONSUMER FRAUD LAWS OF THE VARIOUS STATES
### (By the Nationwide Class)

181.    Plaintiffs incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

182.    Plaintiffs bring this Count XI individually and on behalf of the members of the nationwide Class against Defendant in the alternative to Count II.

183.     By falsely and misleadingly claiming that the Test X180 Products boost testosterone and are "backed by real science," and would prevent such maladies as andropause and its symptoms, including low sex drive, low libido, and loss of muscle mass, Defendant has engaged in unfair competition or unlawful, unfair, misleading, unconscionable, or deceptive acts in violation of the state consumer statutes listed below.

184.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ALA. CODE§ 8-19-1, *et seq.*

185.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STAT. CODE§ 45.50.471, *et seq.*

186.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT.§ 44-1522, *et seq.*

187.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN.§ 4-88-107, *et seq.*

188.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of COLO. REV. STAT.§ 6-1-101, *et seq.*

189.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT § 42-110b, *et seq.*

190.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, *et seq.*

191.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN.§ 28-3901, *et seq.*

192.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. ANN.§ 501.201, *et seq.*

193.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. §10-1-392, *et seq.*

194.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT.§ 480, *et seq.*

195.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE§ 48-601, *et seq.*

196.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILL. COMP. STAT. 505/1, *et seq.*

197.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN.§ 24-5-0.5-1, *et seq.*

198.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of IOWA CODE §714.16, *et seq.*

199.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of KAN. STAT.§ 50-623, *et seq.*

200.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN.§ 367.110, *et seq.*

201.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of LA. REV. STAT.§ 51:1404, *et seq.*

202.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. tit. 5, § 205-A, *et seq.*

203.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CODE. ANN., COM. LAW§ 13-101, *et seq.*

204.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. COMP. LAWS§ 445.901, *et seq.*

205.    Defendant has have engaged in unfair competition or unfair or deceptive acts or practices in violation of MINN. STAT.§ 8.31, *et seq.*

206.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MISS. CODE ANN. § 75-24-3, *et seq.*

207.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT.§ 407.010, *et seq.*

208.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE ANN.§ 30-14-101, *et seq.*

209.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT.§ 59-1601, *et seq.*

210.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. 598.0903, *et seq.*

211.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. ANN.§ 358-A:1, *et seq.*

212.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN.§ 57-12-1, *et seq.*

213.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J.S.A. § 56:8-1, *et seq.*

214.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT.§ 75-1.1, *et seq.*

215.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE§ 51-15-01, *et seq.*

216.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of the OHIO REV. CODE ANN. § 1345.01, *et seq.* and OHIO REV. CODE ANN.§ 4165.01, *et seq.*

217.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of OKLA. STAT. tit. 15, § 751, *et seq.*

218.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT.§ 646.605, *et seq.*

219.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. CONS. STAT.§ 201-1, *et seq.*

220.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN. LAWS § 6-13.1-1, *et seq.*

221.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE§ 39-5-10, *et seq.*

222.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODIFIED LAWS § 37-24-1, *et seq.*

223.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of TENN. CODE ANN.§ 47-18-101, *et seq.*

224.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of TEX. BUS. & COM. CODE ANN.§ 17.41, *et seq.*

225.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of UTAH CODE. ANN.§ 13-11-1, *et seq.*

226.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of VT. STAT. ANN. tit. 9, § 2451, *et seq.*

227.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of VA. CODE ANN. § 59.1-196, *et seq.*

228.    Defendant has engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of WASH. REV. CODE§ 19.86.010, *et seq.*

229.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of W. VA. CODE§ 46A-6-IOI, *et seq.*

230.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT.§ 100.18, *et seq.*

231.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN.§ 40-12-101, *et seq.*

232.    The acts, practices, and misrepresentations by Defendant described above, and Defendant's dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes, because each of these statutes generally prohibit deceptive conduct in consumer transactions. Defendant violated each of these statutes by making false and misleading statements that the Test X180 Products boost testosterone and increase sex drive and libido.

233.    Plaintiffs and Class members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Test X180 Products if the true facts had been known.

## RELIEF DEMANDED

WHEREFORE, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, prays for judgment and relief against Defendant as follows:

A.    An order declaring this action to be a proper Class Action and requiring Defendant to bear the costs of Class notice;

B.    An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendant's past conduct;

C.    An order awarding restitution of the purchase price of the Test X180 Products to Plaintiffs and the proposed Class members; and restitutionary disgorgement of Defendant's revenues from all the Test X180 Product purchases made by Plaintiffs and proposed Class members;

D.    An order compelling Defendant to engage in a corrective advertising campaign to inform the public concerning the true nature of the Test X180 Products, including a recall of the falsely labeled Products;

E.    An order awarding Plaintiffs and the Class members damages and punitive damages in the amount to be determined at trial;

F.    An Order awarding costs, expenses, and reasonable attorneys' fees; and

G.    An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all causes of action so triable.

DATED: December 23, 2014                    Respectfully Submitted,

**BLOCK & LEVITON LLP**

JASON M. LEVITON
JOEL A. FLEMING
155 Federal Street
Boston, Massachusetts 01110
T. 617.398.5600
F. 617.507.6020
Email:  Jason@blockesq.com
          Joel@blockesq.com

**THE LAW OFFICES OF
RONALD A. MARRON**
RONALD A. MARRON (*pro hac* to be filed)
651 Arroyo Drive
San Diego, California 92103
Telephone:     (619) 696-9006
Facsimile:     (619) 564-6665
Email:  ron@consumeradvocates.com

**FARUQI & FARUQI, LLP**
Antonio Vozzolo (*pro hac* to be filed)
369 Lexington Avenue, 10th Floor
New York, New York 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
Email: avozzolo@faruqilaw.com

*Counsel for Plaintiffs and
the Proposed Class*