**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**(WESTERN DIVISION)**

| | |
|---|---|
| DANIEL CAMEY and RAYMOND ALVANDI, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> FORCE FACTOR, LLC, GENERAL NUTRITION CORPORATION, GENERAL NUTRITION CENTERS, INC.,  GNC CORPORATION, S&G PROPERTIES, LLC, GENCOR NUTRIENTS, INC., GENCOR PACIFIC INC., and GE NUTRIENTS, INC., <br><br> Defendants. | Civil Action No. 1:14-cv-14717 <br><br> CLASS ACTION <br><br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Daniel Camey and Raymond Alvandi ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege against Defendants Force Factor, LLC ("Force Factor"), General Nutrition Corporation, General Nutrition Centers, Inc., GNC Corporation, and S&G Properties, LLC (the "GNC Defendants"), Gencor Nutrients, Inc., Gencor Pacific Inc., and GE Nutrients, Inc. (the "Gencor Defendants") (collectively, the "Defendants"), the following upon their own knowledge, or where there is no personal knowledge, upon information and belief and the investigation of their counsel:

## NATURE OF THE ACTION

1.     This is a class action against Defendants arising out of the sale and marketing of the "Force Factor® Test X180" line of testosterone boosting supplements that contain the active ingredient Testofen.  These supplements include "Force Factor® Test X180™," "Force Factor®

Test X180™ Ignite," and "Force Factor® Test X180™ Alpha" (collectively, the "Test X180 Products"). Defendants market the Test X180 Products as "groundbreaking" supplements designed to dramatically boost testosterone levels by as much as 99%.  As a result of this purported boost in testosterone, users of Test X180 Products will experience a variety of benefits, including the ability to increase lean muscle mass, burn fat, and "boost sex drive and libido."

2.      Furthermore, Defendants claim that Test X180 Products are based on "breakthrough" formulas "backed by real science."  In fact, Defendants boast that all of the Test X180 Products contain "one of the only natural ingredients clinically demonstrated to increase free testosterone levels: Testofen."   Testofen is a fenugreek seed extract that contains phytochemical constituents, including Furostanol and Saponins.

3.      Defendants' representations, however, were materially false, misleading and deceptive when made. The Test X180 Products and the proprietary blend of ingredients contained therein (including Testofen) do not significantly boost free testosterone levels in men. Nor do Test X180 Products increase lean muscle mass, burn fat, or boost one's sex drive or libido.  In fact, clinical tests comparing fenugreek – the main active ingredient in Test X180 Products – to placebos, found that fenugreek has no effect on testosterone levels.  Additionally, at least three other studies have similarly shown that fenugreek extract has no effect on free testosterone levels.

4.      Defendants materially misled thousands of consumers, including a significant number of men who are prone to normally decreasing testosterone levels, through a massive advertising campaign. Defendants' advertising involves numerous materially false and misleading statements concerning the Test X180 Products, which have injured Plaintiffs and the

Class by inducing them to purchase worthless products. As a result, Defendants should be held liable for their deceptive conduct in the sale and marketing of Test X180 Products.

5.        Plaintiffs seek relief in this action individually, and as a class action, on behalf of a Nationwide Class and California Sub-Class for: violation of the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*; Massachusetts' Consumer Protection Act, MASS. GEN. LAWS CH. 93A; California's Breach of Express Warranty, Cal. Com. Code §2313; California's Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314; California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; California's Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*; and unjust enrichment.

## PARTIES

6.        Plaintiff Daniel Camey is a citizen of the State of California.

7.        Plaintiff Raymond Alvandi is a citizen of the State of California.

8.        Defendant Force Factor, LLC is a Delaware limited liability company that maintains its principal place of business at 24 School Street Suite 401 in Boston, Massachusetts. Defendant Force Factor, LLC is registered to conduct business in the Commonwealth of Massachusetts under identification number 800451990. Force Factor creates, advertises, and sells a wide variety of supplements, including Factor 2, BRX, Ramp UP, Glutamine, Ketabolic Pro, Omega 3, Test X180, Test X180 Alpha, and Test X180 Ignite. Defendant represents that the Company's "skyrocketing success is a testament to the quality and effectiveness of [its] supplements."  At all times relevant to this Complaint, acting individually or in concert with others, Force Factor marketed and sold Test X180 Products to consumers in the Commonwealth

and throughout the United States. Defendant offers the Test X180 Products for sale in the Commonwealth and nationwide on its own websites and 105 distinct retailers including without limitation GNC, Vitamin Shoppe, and Amazon.com.

9.     Defendant General Nutrition Corporation is a Pennsylvania corporation with its principal place of business in Pittsburg, Pennsylvania.   General Nutrition Corporation is registered to do business in the Commonwealth of Massachusetts under identification number 000853967.

10.     Defendant General Nutrition Centers, Inc., is a Pennsylvania corporation with its principal place of business in Pittsburg, Pennsylvania.   General Nutrition Corporation is registered to do business in the Commonwealth of Massachusetts under identification number 251124574.

11.     Defendant GNC Corporation is a Delaware corporation with its principal place of business in Pittsburg, Pennsylvania.

12.     Defendant S&G Properties, LLC is a Pennsylvania limited liability company having its principal place of business in Harleysville, Pennsylvania.

13.     Collectively, Defendants General Nutrition Corporation, General Nutrition Centers, Inc., GNC Corporation, and S&G Properties, LLC are referred to herein as "GNC" or the "GNC Defendants."

14.     The GNC Defendants are one of the country's largest multichannel specialty retailers of dietary and nutritional supplements, operating more than 6,500 retail locations throughout the United States including Massachusetts and California, and specialize in the sale of and advice to consumers about nutritional supplements.   In fact, GNC Defendants tout that:

> GNC sets the standard in the nutritional supplement industry by demanding truth in labeling, ingredient safety and product potency, all while remaining on the

cutting-edge of nutritional science. As our company has grown over the years, so has our commitment to Living Well. In fact, GNC is the world's largest company of its kind devoted exclusively to helping its customers improve the quality of their lives.[1]

15.    At all relevant times hereto, the GNC Defendants made and/or directly and affirmatively participated in, controlled, and/or adopted the false and misleading advertising and marketing claims about Test X180 Products.  GNC also distributes Test X180 Products through its wholly-owned division, General Nutrition Centers, Inc., and owns and maintains websites, including www.GNC.com, through which it advertised, promoted and marketed the Text X180 Products.

16.    Defendant Gencor Nutrients, Inc., is a California corporation with its principal place of business in Orange County, California.

17.    Defendant Gencor Pacific, Inc., is a Texas corporation with a registered office street address in Austin, Texas.

18.    Defendant GE Nutrients, Inc. is a California corporation with its principal place of business in Orange County, California

19.    Collectively, Defendants Gencor Nutrients, Inc., Gencor Pacific, Inc., and GE Nutrients are referred to herein as "Gencor" or the "Gencor Defendants."

20.    The Gencor Defendants continuously and systematically conduct business in the Commonwealth of Massachusetts and/or regularly do and or solicit business or derive substantial revenues from product services, or products used or consumed in the Commonwealth of Massachusetts.  For example, Gencor supplies Force Factor and fellow competitor Direct Digital, LLC (both maintain their principal place of business in the Commonwealth of Massachusetts) with supplies of Testofen.  Gencor touts itself as a research based group providing "science-

---

[1] http://gnc.mediaroom.com/ (last visited September 3, 2015).

driven" ingredients that are designed to improve quality of life for consumers in a broad range of life stages, which are purportedly validated with human clinical trials and safety studies.  Gencor manufactures, markets, and sells specialized ingredients, including Testofen, a standardized fenugreek extract that is the active ingredient in the Test X180 Products, in over 50 countries worldwide.  The Gencor Defendants take an active role in marketing the Test X180 Products and/or aided and abetted the unlawful practices of Force Factor by, among other acts: providing Force Factor and the public with purported "clinical studies" that supposedly show the efficacy of the Testofen ingredient.  Furthermore, the Gencor Defendants provided Force Factor and other manufacturers with a list of "Approved Health Claims" for the ingredient, including the claims that Testofen: "[s]upports healthy levels of free testosterone," "[p]romotes sexual desire and vitality;" [r]educes recovery time following sexual activity; [s]upports muscle mass; and [p]romotes healthy energy levels."[2]   Further, the Gencor Defendants engaged in "indirect deception" by intending or having reason to expect that the above misleading claims would be repeated and/or its substance communicated to proposed Class Members, and that it would influence their conduct in the purchase of products containing Testofen and the Test X180 Products at issue.  Moreover, in creating the Testofen ingredient and providing Defendants with the "Approved Health Claims" and purported "clinical studies," the Gencor Defendants furnished the means by which the ultimate fraud was accomplished and is therefore equally liable.

21.     Further, at all relevant times, each of the Defendants were engaged in the design, manufacture, production, testing, study, inspection, labeling, marketing, advertising, sale, promotion and/or distribution of Test X180 Products.

---

[2] http://www.gencorpacific.com/index.php/featured-ingredients/testofen (last visited September 3, 2015).

22.     Each of the Defendants acted jointly to perpetrate the acts described herein. At all relevant times alleged in this matter, each Defendant acted in concert with, with the knowledge and approval of and/or as the agent of the other Defendant within the course and scope of the agency, regarding the acts and omissions alleged.

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, and is a class action where Plaintiffs and Class Members are from a different state than Defendants.  Further, at least two thirds of the members of the Class are citizens of a state different from Defendants.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

24.     In addition, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs are alleging that Defendants violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

25.     Personal jurisdiction is derived from the fact that Defendants conduct business or solicit business or derive substantial revenues from product services, products used or consumed within the Commonwealth of Massachusetts, and Defendant Force Factor maintains its headquarters and principal place of business within the Commonwealth of Massachusetts.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events and acts giving rise to the claims herein occurred in this District and Defendant Force Factor's principal place of business is located within this judicial district.

## FACTUAL BACKGROUND

**A.      Testosterone and Andropause**

27.      Testosterone is the principal male sex hormone and an anabolic steroid. Testosterone plays a large role in the health and well-being of men by maintaining sperm production, sex drive, muscle mass, and bone density.  It is the hormone that is primarily responsible for producing and maintaining the typical male characteristics such as body and facial hair, muscle growth, and strength.

28.      Maintaining normal testosterone levels in elderly men has been shown to improve parameters which are believed to cause cardiovascular disease risk, such as increased lean body mass and decreased cholesterol.  Testosterone is also important for sustaining mental and physical energy.

29.      Testosterone is produced mostly in the testes and a small amount of testosterone is produced from steroids secreted by the outer layer of the adrenal glands, also known as the adrenal cortex.

30.      Testosterone primarily circulates in the blood of men in three types or forms. Most of the testosterone in the blood is bound to a protein called sex hormone binding globulin ("SHBG").  Testosterone is also bound to another protein called albumin.  Testosterone that is not bound is considered "free."

31.      The body carefully controls the production and regulation of testosterone. Chemical signals from two locations - the pituitary gland at the base of the brain, and a part of the brain called the hypothalamus - tell the testes how much testosterone to produce.  The hypothalamus controls hormone production in the pituitary gland by means of gonadotropinreleasing hormone ("GnRH").  This hormone tells the pituitary gland to make

follicle stimulating hormone ("FSH") and luteinizing hormone ("LH"). LH signals the testes to produce testosterone.  If the testes begin producing too much testosterone, this is sensed by the brain which sends signals to the pituitary to make less LH.  This, in turn, slows the production of testosterone.   If the testes begin producing too little testosterone, the brain senses this and sends signals to the pituitary gland telling it to make more LH, which stimulates the testes to make more testosterone.

32.     Furthermore, as men age, their ability to produce total, free, and bioavailable testosterone (*i.e.*, not bound by SHBG) gradually declines.  This is due to a number of factors. For example, some men's production of LH decreases with age, which lowers testosterone production.  Moreover, the protein that binds up and holds onto testosterone, SHBG, increases in older men.  This reduces the amount of free (or unbound) testosterone in the blood that is available to tissues, such as muscles.   Aging also causes changes in the daily cycle of testosterone production.  For example, younger men show a spike or peak of testosterone levels in the morning, but this peak is reduced in older men.

33.     "Andropause" is a term frequently used to describe this natural and subtle decline in testosterone production in men as they age.  The most common symptoms of andropause include diminished sexual desire and erectile quality, low fertility rates, fatigue, depression, anxiety, irritability, increased body fat, and loss of strength and muscle mass.  Complications associated with andropause include risk of cardiovascular problems and osteoporosis.

34.     It is estimated that the incidence of andropause in men from ages 50 to 59 is between 6 and 30 percent, with incidence increasing with age.

35.     According to a 2006 study published in the *International Journal of Clinical Practice*, as many as 13.8 million men older than 45 in the United States have low levels of testosterone.

36.     Medically diagnosed low testosterone levels are most often treated with a hormone replacement therapy, specifically testosterone replacement therapies ("TRTs"), which are prescribed to improve both physical and psychological functioning.

37.     TRTs' regimens may only be conducted under the supervision of a licensed physician and require careful monitoring of hormone levels.  TRT can consist of various forms of the hormone using delivery systems including patches, gels, creams, injections, or pellets.

38.     TRT treatments, however, have a number of undesirable side effect and dangers. For example, prolonged use of any testosterone delivery system may result in breast enlargement, increased risk of prostate enlargement, or cancer in older men.  Additionally, patients with preexisting heart, kidney, or liver disease may experience fluid accumulation with or without heart failure.  Moreover, men with breast cancer or known or suspected prostate cancer should not receive testosterone therapy at all as it may increase the risks associated with these conditions.

39.     Despite the risks, TRT treatments have seen a dramatic rise in use as the baby-boomer generation, which accounts for about 30 percent of the U.S. population, which is beginning to feel the natural effects of low testosterone levels.  In fact, treatments for low testosterone have exploded in the U.S., amounting to $1.6 billion in sales in 2011 alone, according to data compiled by Bloomberg.  Sales are expected to triple to $5 billion by 2017, according to Global Industry Analyst, Inc.

**B.      Defendants Capitalize On The Billion Dollar TRT Market**

40.      In an effort to capitalize on the booming TRT market, Defendants began to market Test X180 Products, and/or their ingredient Testofen, as "groundbreaking" supplements designed to boost testosterone levels.  Moreover, as a result of this purported increase in testosterone, users would experience "Heightened Libido," "Enhanced Sexual Performance," "Strengthen Blood Flow," "Build Lean Muscle Mass," "Maximize Power & Stamina," "Burn Fat and Build Muscle," "Boost Sex Drive & Libido," "Enhance Performance," and "Maximize Muscle Mass."

41.      The Test X180 Products consist primarily of a proprietary blend of small amounts of extracts from seeds, herbs, roots, and other organic substances.  The main ingredient in Test X180 Products is Testofen.  Testofen is a fenugreek seed extract that contains phytochemical constituents, including Furostanol and Saponins.

42.      In marketing materials and on product packaging and labeling, Defendants claim the fenugreek seed extract, Testofen, contained in all three of the Test X180 Products is "proven" and "clinically demonstrated" to increase free testosterone levels.  Defendants represent the purported increase in testosterone from Testofen also leads to a variety of additional benefits, including the ability to increase lean muscle mass, burn fat, and "boost sex drive and libido."

43.      Test X-180 is sold in a bottle containing 60 capsules for approximately $69.99 per bottle.  *See* http://www.gnc.com/Force-Factor-Test-X180/product.jsp?productId=12737631 (last visited Sept. 3, 2015).

44.      Test X180 Ignite is sold in a bottle containing 120 capsules for around $79.99 per bottle. *See* http://www.gnc.com/Force-Factor-Test-X180-IGNITE/product.jsp?productId=23933156 (last visited Sept. 3, 2015).

45.     Test X180 Alpha is sold in a bottle containing 120 capsules for around $139.99 per bottle.   *See*  http://www.gnc.com/Force-Factor-Test-X180-ALPHA/product.jsp?productId= 16633956 (last visited Sept. 3, 2015).

C.     **False And Misleading Marketing of Test X180 Products**

46.     Defendants engaged in a massive, uniform marketing and advertising campaign designed to convince consumers that Test X180 Products, and the ingredient therein Testofen, naturally and dramatically boosts testosterone levels.  Defendants then disseminated materially false and misleading statements which represent, both expressly and by implication, that scientific clinical tests prove the Test X180 Products will dramatically boost testosterone levels and further, those users of Test X180 Products will experience a variety of benefits, including the ability to increase lean muscle mass, burn fat, and "boost sex drive and libido."  Further that, users of Test X180 Products will experience a variety of benefits, including the ability to increase lean muscle mass, burn fat, and "boost sex drive and libido."  These materially false, misleading, and deceptive statements were disseminated in a prolonged, multiplatform advertising and marketing campaign, labels and/or product packaging and in various media including industry periodicals, magazines, newspapers, television and internet media and or social/media.

47.     This extensive and comprehensive advertising and marketing campaign was designed to induce consumers to purchase Test X180 Products in reliance upon these representations and/or material omissions.

1.     **Force Factor**

48.     Force Factor maintains a principal place of business in Boston, Massachusetts; its conduct at issue in this Complaint occurs substantially in the Commonwealth of Massachusetts.

49.    Force Factor primarily advertises and promotes Test X180 Products through uniform labeling claims on the front of the Products' packaging.  Label descriptions on the Products' packaging, taken as a whole, represent there are various benefits and characteristics to the Products including the ability to dramatically increase testosterone levels, burn fat, build muscle, boost sex drive and libido, and enhance performance.  Moreover, that the Test X180 Products feature Gencor's Testofen ingredient, the purportedly "well-known, effective compound your body needs to combat natural testosterone decline."

50.    Test X180 Products are also the subject of an extensive and comprehensive advertising and marketing campaign in various media including the internet through ESPN, CNN, Yahoo sports, SI.com, healthheadlines.com, and on Defendant's own websites.

51.    Defendant Force Factor advertises, distributes and sells the Test X180 Product directly to consumers online at www.forcefactor.com, www.testx180.com, and through nationwide retailers, including GNC stores and GNC's respective websites at www.gnc.com and www.Luckyvitamin.com.

### a.    **Label and Packaging**

52.    The front label of Text X180 (*Exh. A*) features the misleading sub-headings "Boost Sex Drive & Libido," "Enhance Performance," "All-in-One Male Vitality Supplement," and "Free Testosterone Booster and Fat Burner."

53.    The side label (*Exh. A*) states that Test X180 is a "premium Male Performance Formula" and that "with Text X180, you can build bigger muscles," "increase your libido," and heighten "sexual appetite for a more satisfying love life."

54.    The side label further states:

Each serving of Test X180 contains clinically researched levels of Testofen®, the proven, natural fenugreek seed extract that has been shown to help men add

13

pounds of hard, sculpted muscle to their bodies.  Testofen is the well-known, effective compound your body needs to combat natural testosterone decline.  With no side effects it will help you safely boost your testosterone levels, your muscle mass, and your confidence.

(*Exh. A*).

55.     The label further boasts that the Test X180 Product is backed by real science by making claims such as:

- "The experts at Force Factor carefully formulated Test X180 … with premium, clinically supported compounds like Testofen;"

- "The ingredients in our proprietary blend are substantiated with rigorous research and hard, scientific facts;"

- "Each serving of Test X180 contains clinically researched levels of Testofen®, the proven, natural fenugreek seed extract that has been shown to help men add pounds of hard, sculpted muscle to their bodies;"

- "Testofen is the well-known, effective compound your body needs to combat natural testosterone decline;" and

- "With no side effects, it will help you safely boost your testosterone levels."



56.     The front label of Test X180 Ignite (*Exh. B*) similarly features the misleading sub-headings "Boost Sex Drive & Libido," "Enhance Performance," "All-in-One Male Vitality Supplement," and "Free Testosterone Booster and Fat Burner."   The side label (*Exh. B*) further states that Test X180 Ignite will increase "libido and performance" and "increase their sex drive" suggesting that Test X180 Ignite's ingredients work as advertised, *i.e.,* as a testosterone booster and aphrodisiac.

57.     In addition, the side label (*Exh. B*) states that "Test X180 Ignite was developed to be the ultimate all-in-one free testosterone booster, using safe, trusted ingredients backed by real science" and that "Test X180 Ignite is fueled by Testofen®, a natural fenugreek seed extract used by men worldwide."

58.     The label of Test X180 Alpha (*Exh. C*) also features the misleading sub-headings "Heighten Libido," "Enhance Sexual Performance," "Strenghten Blood Flow," "Builds Lean Muscle Mass," "Maximize Power & Stamina," and "The Prefered Testosterone Booster of Elite Men."

15

59.     The Test X180 Alpha Product label (*Exh. C*) further states that "Alpha males don't settle for mediocrity," and that "Test X180 Alpha offers the complete solution for staggering virlity, from dominating tough workouts in the gym to exceeding expectations in the bedroom" suggesting that the ingredients in Test X180 work as advertised, *i.e.*, as a testosterone booster and aphrodisiac.

60.     In addition, the Test X180 Alpha label (*Exh. C*) states that "the Force Factor team perfected the Test X180 Alpha formula with one of the only natural ingredients clinically demonstrated to increase free testosterone levels: Testofen" and that "With Test X180 Alpha, you'll start to transform your physique and have better sex.  End of story."

61.     These above claims are false and misleading for the reasons described herein.

### b.     Websites and Digital Advertising

62.     Defendant Force Factor also makes similar misrepresentations on its website regarding the benefits of the Test X180 Products as a testosterone booster.  For example, Defendant's website with respect to Text X180 states:

How do you safely increase testosterone levels? Well-researched ingredients are the answer, which is why the experts at Force Factor® formulated Test X180™ with premium, clinically supported compounds like Testofen®. There's no reason to take a chance on unsafe, sketchy supplements. The ingredients in our proprietary blend are substantiated with rigorous research and hard, scientific facts – the same smart science behind the entire line of Force Factor products.

Testosterone boosters aren't just for pro bodybuilders; they are the answer for every guy who wants to challenge his declining testosterone and perform at the highest level. Ready to feel like a superhero in the gym and in the bedroom? With Test X180, you can finally achieve maximum muscle gains, mind-blowing performance, and the explosive results you've been craving.

http://www.forcefactor.com/products/test_x180 (last visited Sept. 3, 2015)

63.   Similarly, Force Factor's TestX180 Ignite website boasts the ability to boost testosterone levels, lean muscle mass, sex drive and libido.  Specifically, the website states:

> **Test X180 Ignite** – Natural Testosterone Builder That Improves Your Muscle Mass!
>
> Test X180 is a revolutionary product that boosts your testosterone levels, which has wide ranging benefits for men of all ages. Rock hard muscles and sculpted abs are not reserved just for bodybuilders, you too can see these amazing results by simply purchasing Test X180 Ignite. Not only will your body transform, but your virility and sex drive will also benefit greatly.

http://testx180ignite.com/ (last visited Sept. 3, 2015).

64.   Similarly, Force Factor's TestX180 Alpha website boasts the ability to boost testosterone levels, "Heighten Libido," "Enhance Sexual Performance," "Strengthen Blood Flow," "Build Lean Muscle Mass," and "Maximize Power & Stamina."  Furthermore, that "the natural ingredient Testofen® is clinically demonstrated to raise your body's free testosterone levels for dramatic increases in libido, strength, and stamina."   http://forcefactor.com/products /test_x180_alpha (last visited Sept. 3, 2015).

65.   Furthermore, many of the advertisements feature photographs of or quotations of physically fit and/or professional athletes lauding the benefits of TestX180 Ignite.  A screenshot captured from Defendant's website featuring an image of an athlete and quotation from Vernon Davis, a professional NFL player, is provided below:



http://testx180ignite.com/ (last visited Sept. 3, 2015).

66.    Defendant's website promoting a free trial of the Test X180 Products makes similar representations.  Screenshots captured from Force Factor's website featuring additional photographs and quotations from professional athlete Vernon Davis:







http://www.forcefactor.com/lg/15381/pid=180&aff_id= (last visited Sept. 3, 2015).

67.     Additionally, Defendant's materially false and misleading marketing campaign includes representations made on social media websites.  For example, Defendant states on the Facebook profile for Test X180[3] that Test X180 Ignite is "[t]he most advanced free testosterone booster yet."  The Facebook page also maintains numerous photos and representations that Test X180 is a "natural" testosterone booster with "clinically researched ingredients" that will "Boost free testosterone by 99%":

---

[3] *See* https://www.facebook.com/pages/Test-180-Ignite/497345623687627 (last visited Sept. 3, 2015).



https://www.facebook.com/497345623687627/photos/pb.497345623687627.-
2207520000.1416242283./502468336508689/?type=1&theater (last visited Sept. 3, 2015).

68.    Similarly, Force Factor's Twitter (July 13, 2015) page touts "The Science Behind

Demonstrated Results"[4]:



---

[4] https://twitter.com/search?q=test%20x180&src=typd (last visited Sept. 3, 2015).

69.     Defendant Force Factor also utilized video advertisements and commercials as a medium to disseminate misleading information.  For example, Defendant represents in video advertisements and commercials that Test X180 Ignite will dramatically increase free testosterone by 96%:



http://www.youtube.com/watch?v=sfXVMiYrcFg&index=2&list=UUYZPWYeZA4GJTeGf3xg HmHw (last visited Sept. 3, 2015).

**PURPORTED "RIGOROUS" CLINICAL RESEARCH**

70.     Moreover, Defendant Force Factor represents that Test X180 Products are "backed by real science" and "substantiated with rigorous research and hard scientific facts" to boost testosterone levels, boost sex drive and libido, and are effective for their intended use.  For example, Defendant claims the "Test X180 line was developed by Harvard grads using proven scientific methods."  Furthermore, that Testofen, the purported active ingredient in Test X180 Product is "clinically researched" and has been shown to "help men add hard, sculpted muscle to

their bodies and boost their libido by increasing free testosterone safely and effectively."

Defendants use ornate graphics on its website to bolster the scientific claims:



http://www.testx180.com/science (last visited Sept. 3, 2015).

71.     Furthermore, Defendant boasts the presence of "clinically researched"

ingredients.  A screenshot captured from Defendant's website is provided below:



http://www.testx180.com/science (last visited Sept. 3, 2015).

72.     Similarly, Force Factor states on its website that the Test X180 Products are "substantiated with rigorous research and hard, scientific facts."[5]   Accordingly:

> How do you safely increase testosterone levels? Well-researched ingredients are the answer, which is why the experts at Force Factor® formulated Test X180™ with premium, clinically supported compounds like Testofen®. There's no reason to take a chance on unsafe, sketchy supplements. The ingredients in our proprietary blend are substantiated with rigorous research and hard, scientific facts – the same smart science behind the entire line of Force Factor products.

73.     Force Factor also maintains a section on its website titled "Test X180 Ignite-Does it Really Work?" reinforcing the misrepresentation that Test X180 Products are "clinically proven":

> If you are looking to boost your testosterone naturally using a clinically proven safe method, you should try Test X180 Ignite. This testosterone booster works quickly to make you not only feel younger, but also help your body work more efficiently at creating muscle mass. This product will help you make the most out of your workouts and even allow your body to recover at record rates.
>
> This product is completely safe and studies show that no side effects are caused by use of this testosterone booster. Test X180 Ignite is created using a formula that was expertly crafted to yield real results for all users.

http://testx180ignite.com (last visited Sept. 3, 2015).

74.     Similarly, Force Factor has created and sponsored a multitude of affiliated websites touting that Test X180 Products and its ingredients are purportedly backed by significant funding and "years" of scientific research.  For example, www.healthheadlines.com states:

> Introducing Testofen. After years of research and millions of dollars spent, scientists agree that this game-changing ingredient formulated from a natural fenugreek seed extract is the best way to boost free testosterone and get an insane boost in libido.  We've tested it personally and believe us; it's worth the hype.

http://www.healthheadlines.com/fitness/test-x180-a-brand-new-supplement-hits-the-shelves-24_7898/ (last visited Sept. 3, 2015).

---

[5] http://www.forcefactor.com/products/test_x180 (last visited Sept. 3, 2015).

75.     Additionally, Force Factor's marketing materials contain numerous testimonials and/or "before and after" photos to bolster their claims.  None of the advertisements, however, disclose whether the results are typical.  For example, a screenshot captured from Defendant's websites are provided below:



http://testx180ignite.com (last visited Sept. 3, 2015).



http://testx180ignite.org (last visited Sept. 3, 2015).

76.     The Test X180 Products, however, do not work as testosterone boosters or as aphrodisiacs and the express claims of increased muscle mass and sexual performance enhancement were *per se* materially false and misleading when made.

### 2. **GNC Defendants**

77.     The GNC Defendants participated in, controlled, adopted and/or reinforced the false and misleading advertising claims about Test X180 Products, by among other things: (1) displaying Test X180 Products and their false packaging claims on their store shelves; (2) utilizing false and misleading in-store Test X180 Products advertisements, displays and/or exhibits; (3) displaying Test X180 Products and their false packaging claims on the GNC branded website, including pictures of the false and deceptive packaging and labeling of the Test X180 Products on its websites; (4) making statements on their websites that repeated and reinforced the false and misleading statements contained on the packaging and labeling of the Test X180 Products; (5) reviewing and approving false and misleading advertising materials for promoting the sale of Test X180 Products, including advertisements that bore the retailers' names, logos and/or trademarks; and (6) selling Test X180 Products to end users in the United States including the Commonwealth of Massachusetts and California.

### a. **Retail Displays**

78.     The GNC Defendants have more than 6,500 stores nationwide operating under the GNC brand name.

79.     The GNC Defendants' retail stores have standardized point-of-sale displays that include shelf signage, floor displays and checkout displays.

80.     In 2009, the GNC Defendants announced plans to carry Force Factor's line of products on its store shelves. *See* http://www.forcefactor.com/news/gnc (last visited Sept. 3, 2015).

81.     The GNC Defendants display Test X180 Products and their false packaging claims on store shelves, and also utilize false and misleading in-store Test X180 Products advertisements, displays and/or exhibits to sell Test X180 Products to end users in retail stores.

**b.      Relationship with Force Factor**

82.     In fact GNC provides substantial assistance to Force Factor by allowing Force Factor to capitalize on GNC's brand recognition and reputation, which holds itself out as "set[ting] the standard in the nutritional supplement industry by demanding truth in labeling, ingredient safety and product potency."[6]   For example, the GNC Defendants are repeatedly featured in the marketing and advertising of Test X180 Products, which represents to consumers that Test X180 Products can be purchased from a trusted source, GNC.[7]   A screenshot of Force Factor's website is provided below:[8]



83.     Additionally, GNC is prominently featured on Force Factor's website instructing consumers where to buy the Test X180 Products. A screenshot of Force Factor's website is provided below:[9]

---

[6] http://gnc.mediaroom.com/ ((last visited September 3, 2015).
[7] https://www.gnc.com/Force-Factor-Test-X180-IGNITE/product.jsp?productId=23933156 (last visited Sept. 3, 2015)
[8] https://www.forcefactor.com/store_locator  (last visited Sept. 3, 2015).
[9] http://www.forcefactor.com/ (last visited Sept. 3, 2015).



84.     Moreover, in 2009, the GNC Defendants awarded Force Factor the GNC's Rising Star Award, an accolade that Force Factor consistently touts as a testament to its success.[10]



### c.     GNC's Websites

85.     The GNC Defendants repeated and reinforced the false and misleading advertising of Test X180 Products by similarly attesting that Test X180 has the ability to (1) "Maximize Muscle Mass," (2) "Boost Sex Drive & Libido," and (3) Enhance Performance."[11]

86.     The GNC Defendants incorporated or adopted marketing and advertising language from Force Factor. For example, GNC Defendants made specific representations concerning the "Science" behind Test X180 to bolster the alleged benefits of the product, stating: "Each serving of Test X180 contains clinically researched levels of Testofen the proven, natural fenugreek seed extract that has been shown to help men add pounds of hard, sculpted muscle to their bodies.  Testofen is the well-known, effective compound your body needs to combat natural testosterone decline."[12]  A screenshot of GNC Defendants' website is provided below:[13]

---

[10] https://www.forcefactor.com/wholesale (last visited Sept. 3, 2015).
[11] http://www.gnc.com/Force-Factor-Test-X180/product.jsp?productId=12737631 (last visited Sept. 3, 2015).
[12] http://www.gnc.com/Force-Factor-Test-X180/product.jsp?productId=12737631(last visited Sept. 3, 2015).

| Description | Supplement Facts | Label | Ratings and Reviews | Ask A Question |

- Maximize Muscle Mass
- Boost Sex Drive & Libido
- Enhance Performance

**Test X180™ Science**
The Science of Peak Performance
As men age, their natural production of testosterone begins to decline. Some just accept this and cope with less energy, decreased muscle mass, and a weaker sex drive. But why settle? With Test X180, you can build bigger muscles, increase your libido, and look and feel invincible.

The experts at Force Factor® carefully formulated Test X180 to provide the boost that every man needs. By naturally raising your levels of free testosterone, Test X180 improves workout performance to sculpt the muscles you crave and heightens sexual appetite for a more satisfying love life. You'll look more desirable from your work in the gym and feel more desire in the bedroom. No matter what you're doing, Test X180 gives you an extra push to perform at your peak.

Each serving of Test X180 contains clinically researched levels of Testofen the proven, natural fenugreek seed extract that has been shown to help men add pounds of hard, sculpted muscle to their bodies. Testofen is the well-known, effective compound your body needs to combat natural testosterone decline. With no side effects, it will help you safely boost your testosterone levels, your muscle mass, and your confidence.

Test X180's potent, proprietary blend also includes key ingredients like ginseng, Tribulus terrestris, and cordyceps. Together, these natural ingredients work to help increase blood flow to your extremities – intensifying your libido. A vitamin blend, including vitamins D, B12, and B6, completes the powerful formula, giving your body exactly what it needs for both work and play.

There's no need to take a chance on your health with untested, risky ingredients. Look and feel confident while you perform at your peak with the trusted ingredients in Test X180. You have nothing to lose and everything to gain.

**Maximize Results With Stacking**
Test X180 was designed to deliver great results on its own, but you can get even more out of your workouts by stacking it with other premium Force Factor products. Pack on lean muscle and increase your power and stamina by stacking it with Factor 2™. Wash it down with BRX™ before hitting the gym to dominate your most brutal workouts.
*These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.*

87.    The GNC Defendants also maintain copies of the Test X180 product labels on its website:[14]

---

[13] http://www.gnc.com/Force-Factor-Test-X180/product.jsp?productId=12737631 (last visited Sept. 3, 2015)
[14] http://www.gnc.com/graphics/product_images/pGNC1-12488894_gnclabel_pdf.pdf (last visited Sept. 3, 2015).



88.     Separately, the GNC Defendants advertise Test X180 Alpha as a product that can "Enhance Sexual Performance," "Strength[en] Blood Flow," "Build Lean Muscle Mass," and "Maximize Power & Stamina."[15] A screenshot of GNC Defendants' website is provided below:[16]

---

[15] http://www.gnc.com/Force-Factor-Test-X180-ALPHA/product.jsp?productId=16633956&green=4F5A2E18-25A9-5361-A228-89812B39A38C (last visited Sept. 3, 2015).

[16] http://www.gnc.com/Force-Factor-Test-X180-ALPHA/product.jsp?productId=16633956 (last visited Sept. 3, 2015).

89.    The GNC Defendants further proclaim that Test X180 Alpha, "[w]hen paired with your workouts, the natural ingredients Testofen is clinically demonstrated to raise your body's free testosterone levels for dramatic increases in libido, strength and stamina."[17]

90.    The GNC Defendants also maintain copies of the Test X180 Alpha's product labels on its website:[18]

---

[17] http://www.gnc.com/Force-Factor-Test-X180-ALPHA/product.jsp?productId=16633956 (last visited Sept. 3, 2015).

[18] http://www.gnc.com/graphics/product_images/pGNC1-14403129_gnclabel_pdf.pdf (last visited Sept. 3, 2015).



91.     The GNC Defendants also advertise Test X180 Ignite as a "[b]reakthrough [f]ormula for [t]ransformative [r]esults," stating the product "was developed to be the ultimate all-in-one testosterone booster, using safe, trusted ingredients backed in real science" and "is fueled by Testofen®, a natural fenugreek seed extract used by men worldwide to help increase lean muscle mass and jumpstart their energy, libido, and performance."[19]   A screenshot of the GNC Defendants' website is provided below:[20]



92.     The GNC Defendants also maintain copies of the Test X180 Ignite product labels on its website:[21]



93.     Moreover, the GNC Defendants knew that the statements concerning the efficacy of Test X180 Products were false, misleading and baseless.[22]   According to the GNC Defendants, "[f]rom our scientific research and new product discovery to our manufacturing and packaging processes and finally our interaction with customers in our stores, everything GNC does is done with rigorous quality."[23] In fact, GNC maintains a medical advisory board, which according to the GNC Defendants, "utilizes their in-depth medical knowledge and experience to

---

[21] http://www.gnc.com/graphics/product_images/pGNC1-16783859_gnclabel_pdf.pdf (last visited Sept. 3, 2015).

[22] This information is solely within GNC's possession.

[23] GNC Holdings, Inc. Code of Business Conduct and Ethics at iii, *available at* http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MTc0ODE3fENoaWxkSUQ9LTF8VHlwZT0z&t=1 (last visited Sept. 3, 2015).

aid in the creation and ongoing development of GNC products, helping GNC stay on the forefront of product innovation and delivering on our commitment to helping you LIVE WELL."[24]  A screenshot of GNC Defendant's website is provided below[25]:



94.     GNC has also developed their own line of testosterone boosters called "Healthy Testosterone Formula," which contains, among other ingredients, Testofen as its single largest ingredient.[26]  GNC states on product packaging that its "Healthy Testosterone Formula," product featuring Testofen was scientifically developed utilizing the expertise of (and endorsed by) GNC's "Medical Advisory Board."   Not surprisingly, GNC represents that its Healthy Testosterone Formula featuring Testofen is clinically shown to: improve sexual health, blood flow and optimal vitality; fuels lean muscle mass & supports a healthy metabolism, and is designed to support testosterone levels that decline with age.   Similarly, GNC developed "Beyond Raw Re Test Hardcore Anabolic Enhancer," also featuring Testofen, which purportedly "[s]upports [h]ealthy [t]estosterone [l]evels."[27]  GNC's "Medical Advisory Board," composed of "world renowned" Board Certified physicians, knew or should have known that the sale and

---

[24] https://www.gnc.com/graphics/product_images/pGNC1-13402640_gnclabel_pdf.pdf (last visited Sept. 3, 2015).
[25] http://www.gnclivewell.com/MAB/ (last visited Sept. 3, 2015).
[26] http://www.gnc.com/GNC-Preventive-Nutrition-Healthy-Testosterone-Formula/product.jsp?productId=22738816 (last visited Sept. 3, 2015).
[27] http://www.gnc.com/GNC-Beyond-RAW-RE-TEST/product.jsp?productId=22750216 (last visited Sept. 3, 2015).

promotion of Test X180 Products are false and misleading and baseless.   Regardless, GNC buries an admission in its website that states: "[i]n men, testosterone levels peak in young childhood and decline over time.   A number of supplements are marketed as natural testosterone support, though the effects have not been demonstrated in clinical research."[28]

### 3.   Gencor Defendants

94.     Gencor Defendants manufacture the herbal ingredient Testofen, a standardized extract of Trigonella foenum-graecum (more commonly known as fenugreek). Defendants market and sell the ingredient Testofen as "proven" testosterone boosters to numerous sports nutrition companies that manufacture nutritional supplements.

95.     For example, on Gencor's website, the Gencor Defendants tout the purported benefits and market opportunity for the ingredient, stating, "Incorporate Testofen in product formulations designed to support healthy sexual function and performance in adult males." The page also features a video clip of Gencor's Chief Scientific Advisor, Paul Clayton, Ph.D., discussing the purported benefits of taking Testofen.[29] A screenshot from Defendants' website is reproduced below:[30]

---

[28] http://www.gnc.com/Force-Factor-Test-X180/product.jsp?productId=12737631 (last visited Sept. 3, 2015)..
[29] https://youtu.be/NL_4G13Y1is (last visited Sept. 3, 2015).
[30] http://www.gencorpacific.com/index.php/featured-ingredients/testofen (last visited Sept. 3, 2015).



96.     Gencor Defendants state, "Gencor provides clinically proven ingredients formulated to support your customer's specific lifestyle health issues." http://www.gencor pacific.com/index.php/featured-ingredients (last visited Sept. 3, 2015).

97.     When Gencor marketed the sale of Testofen, Gencor publicly released information about the purported and "proven" benefits of Testofen with knowledge, reason to know, and/or intent that the information would be repeated by sellers of the Test X180 Products, and consumers purchasing the Test X180 Products would rely on the information.

98.     In doing so, the Gencor Defendants supplied the false and misleading information regarding alleged efficacy of Testofen to Force Factor and the GNC Defendants who ultimately

marketed and sold the ineffective products to unsuspecting consumers. Gencor is, therefore, equally liable to consumers as the other Defendants.

99.    To facilitate this misleading conduct, Gencor Defendants also released a video featuring Dr. Paul Clayton-Chief Scientific Advisor at Gencor, suggesting that Testofen is similar in structure to a "steroidal hormone" and will in fact result in "a doubling of free testosterone levels."[31]   An excerpt from the transcript of the promotional video is provided below:

> Testofen is a standardized extract from the culinary herb fenugreek.  Uh it's very carefully extracted and standardized to its content of fenusides: these are saponins which means that they have a molecular structure a little bit like a steroid hormone.
>
> When you ingest these, they're enough like a steroid hormone to bind to a protein in the blood called sex hormone binding globulin.  And when that happens, a very small percentage of the testosterone that's bound to this protein is released and activated.
>
> This results in approximately a doubling of free testosterone levels.  Now that's important because as we get older, as we get more stressed, more tired by the constant demands of work and life in general very often testosterone levels fall.  And as they do we experience a loss of libido, of drive, uh, muscle tone as well because testosterone is very important in building muscles.
>
> By taking Testofen and achieving a doubling of free testosterone levels all of these adverse charges are reversed.  And what we've shown in a number of studies is that when combined with exercise, this leads to increased muscle building.  And in a very interesting double-blind randomized clinical trial that we carried out in Australia [inaudible stumbling on words] that we found that there was very dramatic improvements in libido, sexual performance, sexual satisfaction in a group of young to middle-aged males.
>
> This is a very interesting product because I think the first time we have something that genuinely enhances sexual function and sexual desire.  Now the drugs like Viagra which inhibit the enzyme phosphodiesterase, a pde5, act on the hydraulic elements if you will, of male sexuality, but they don't have any impact on

---

[31] http://www.gencorpacific.com/index.php/featured-ingredients/testofen (last visited Sept. 3, 2015).

women.  And although these are used as party drugs, they're not very good for couples, in fact they've been very destructive in many cases of long-established relationships.

What we have here is a compound that enhances sexual desire, libido, in both males and we're now finding in females too.  So this is very much a supplement, a herb that couples can take and um a remedy perhaps for the seven year itch.

100.    Additionally, the Gencor Defendants list on its website "approved health claims for the ingredient, Testofen: "supports healthy levels of free testosterone," "promotes sexual desire and vitality," "reduces recovery time following sexual activity," "supports muscle mass," and "promotes healthy energy levels."   A screenshot from Gencor's website is reproduced below:[32]

---

[32] http://www.gencorpacific.com/index.php/featured-ingredients/testofen (last visited Sept. 3, 2015).



Approved health claims

The following structure-function claims for Testofen® are provided here for informational purposes only and should be reviewed by your legal counsel prior to use in marketing materials, including product labels.

- Supports healthy levels of free testosterone*
- Promotes sexual desire and vitality*
- Reduces recovery time following sexual activity*
- Supports muscle mass*
- Promotes healthy energy levels*
- Helps reduce normal symptoms of Andropause in men over age 40*

101.   These misrepresentations are substantially similar, if not identical, to the misrepresentations that appear on the TEST X180 Product, as illustrated in the chart below:

| GENCOR WEBSITE | TEST X180 LABELING |
|---|---|
| The following structure-function claims for Testofen® are provided here for informational purposes only and should be reviewed by your legal counsel prior to use in marketing materials, including product labels. | |

| | |
|---|---|
| • Supports healthy levels of free testosterone* <br> • Promotes sexual desire and vitality* <br> • Reduces recovery time following sexual activity* <br> • Supports muscle mass* <br> • Promotes healthy energy levels* <br> • Helps reduce normal symptoms of Andropause in men over age 40* | • "Safely boost your testosterone levels"[33] <br> • "Boost Sex Drive & Libido"[34] <br> • "Boosts vitality"[35] <br> • "Enhance Performance"[36] <br> • "Maximize muscle mass"[37] |

102. Similarly, Gencor Defendants maintain references to clinical research on its website, with knowledge, reason to know, and/or intent that the information would be repeated by sellers of the Product and consumers purchasing the Products would rely on the information repeated by such sellers. For example, Defendants cite to several misleading studies, including by Sachin Wankhede, Vishwaraman Mohan and Prasad Thakurdesai (the "Pilot Study"), stating "the active group" in the Pilot Study displayed a range of "mainly statistically significant results." *See* http://www.gencorpacific.com/index.php/featured-ingredients/testofen (last visited September 2, 2015). Additionally, Gencor states on its website that results from the Pilot Study demonstrate, among others, "[s]ignificant support for free testosterone (p<0.05) compared to placebo group."[38] Force Factor parrots these claims in its marketing materials, stating:

> • "The ingredients in our proprietary blend are substantiated with rigorous research and hard, scientific facts;"[39]

[33] *See*, ¶¶ 42, 45, 47, 48, 50-57, 60-62, 64-65, 67.
[34] *See*, ¶¶ 42, 45, 46, 48, 49, 51, 53, 56-57, 62.
[35] *See*, ¶¶ 45, 48.
[36] *See*, ¶¶ 35, 42, 45-46, 48-49, 55, 55, 57.
[37] *See*, ¶¶ 35, 37, 42, 46, 47, 52, 55-57, 62, 64.
[38] http://www.gencorpacific.com/index.php/featured-ingredients/testofen (last visited Sept. 3, 2015).
[39] *See* ¶¶ 48, 55, 62.

- "Each serving of Test X180 contains clinically researched levels of Testofen®, the proven, natural fenugreek seed extract that has been shown to help men add pounds of hard, sculpted muscle to their bodies;"[40]
- "Testofen is the well-known, effective compound your body needs to combat natural testosterone decline;"[41]

### D. The Test X180 Products and the Active Ingredients Therein, Including Testofen, Do Not Boost Testosterone Levels

103.   The Test X180 Products, however, do not work as testosterone boosters or as aphrodisiacs and the express claims of increased muscle mass and sexual performance enhancement were *per se* materially false, misleading and/or deceptive when made.

104.   Gencor Defendants prominently displayed and/or referenced several studies on Gencor's website to represent that Testofen, the active ingredient in "Test X180," "Test X180 Ignite," and "Test X180 Alpha" is "proven' and/or "clinically demonstrated to dramatically increase free testosterone levels in the human male, by upwards of 96%," thereby "boost[ing] sex drive and libido," "enhanc[ing] performance," and increasing "lean muscle mass."

105.   For example, Gencor cites to a study titled "Human Study on Free Testosterone and Performance" to demonstrate, among others, "[s]ignificant support for free testosterone (p<0.05) compared to placebo group" (the "Pilot Study.").[42]   A screenshot from Defendants' website is reproduced below:[43]

---

[40] *See* ¶¶ 37, 47, 48, 50.
[41] *See* ¶¶ 37, 47, 48, 50.
[42] Wankhede S, Mohan V, Thakurdesai P, Beneficial effects of fenugreek glycoside supplementation in male subjects during resistance training: a randomized controlled pilot study, Journal of Sport and Health Science (2015), doi: 10.1016/j.jshs.2014.09.005.
[43] http://www.gencorpacific.com/index.php/featured-ingredients/testofen (last visited Sept. 3, 2015).

**Human study on free testosterone and performance***
**Study Results:** A double-blind, randomized, placebo-controlled human clinical study of 60 subjects was conducted using Testofen as the sole ingredient. The active group demonstrated the following mainly statistically significant results:

- Significant anabolic activity as evidenced by BUN reduction (p<0.05) compared to placebo*
- Significant support for free testosterone (p<0.05) compared to placebo group*
- Immune support (p<0.003) compared to placebo group*
- Significant support for Serum Creatinine levels (p<0.02) compared to placebo group signifying support for Creatine uptake and recycling in muscle cells*
- Significant support for prolactin (p<0.04) compared to placebo group, however, this increase is within physiological limits for men*
- Significant decrease in body fat compared to baseline*
- Supports maintenance of muscle size despite maintaining overall weight and reduction of body fat* (although not significant)

**Citation:** Wankhede S, Mohan V, Thakurdesai P, Beneficial effects of fenugreek glycoside supplementation in male subjects during resistance training: a randomized controlled pilot study, Journal of Sport and Health Science (2015), doi: 10.1016/j.jshs.2014.09.005.

106.     Similarly, Gencor Defendants rely on a 2010 study of Testofen on the reproductive systems of male albino rats to suggest that Testofen supported an increase in the weight of the ani-levator muscle, which led to support for muscle mass and body weight (the Aswar Study.").[44]

107.     Lastly, Gencor Defendants rely on a 2009 study entitled[45] "Human Study on Adult Male Sexual Desire" enrolling 60 adult males utilizing a formulation containing Testofen as a major ingredient to suggest a "statistically significant increase in the sexual function, performance and satisfaction of the active group" (the "Steels Study.").[46]

108.     Defendants, however, misrepresent the results from these clinical trial(s).  In other words, the results cited by and relied upon by the Defendants in support of its advertising claims do not actually support the proposition for which the studies are cited.

[44] Urmila Aswar et.al, 2010. Effect of Furostanol Glycosides from Trigonella foenum –graecum on the reproductive system of Male Albino Rats. Phytotherapy Research, 24, 1482–1488.
[45] Steels, E., Rao, A. and Vitetta, L., 2011. Physiological Aspects of Male Libido Enhanced by Standardized Trigonella foenum-graecum Extract and Mineral Formulation. Phytotherapy Research, Vol. 25, 1294–1300. doi: 10.1002/ptr.3360.
[46] http://www.gencorpacific.com/index.php/featured-ingredients/testofen (last visited Sept. 3, 2015).

109.    As noted above, as support for its "proven" clinical results and general and specific product claims, Gencor Defendants rely on a Pilot Study, which is an exploratory study that does not support Defendants' bold, unqualified representations and promises.

110.    Rather, an exploratory or pilot study, by its very nature, does not provide conclusive or even reliable results. Instead, a pilot study is a small-scale preliminary study conducted in order to evaluate feasibility, time, cost, adverse events, and statistical variability in an attempt to predict an appropriate sample size and improve upon study design prior to performing a full-scale research project or clinical study. *See, e.g.*, Andrew C. Leon et al., The Role and Interpretation of Pilot Studies in Clinical Research, J. Psychiatr. Res. 45(5) at 626-29 (May 2011) ("A pilot study is not a hypothesis testing study. . . . [A] pilot study does not provide a meaningful effect size estimate for planning subsequent studies due to the imprecision inherent in data from small samples.  Feasibility results do not necessarily generalize beyond the inclusion and exclusion criteria of the pilot design. . . . For purpose of contrast, a hypothesis testing clinical trial is designed to compare randomized treatment groups in order to draw an inference about efficacy/effectiveness and safety in the patient population, based on sample results.").  In fact, however, such pilot studies cannot be the basis of formal proof of efficacy. Rather, the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use ("ICH"), which issues "Good Clinical Practices" guidelines ("ICH GCP") [47] concludes that such exploratory studies/trials "cannot be the basis of

---

[47] The ICH GCP is an international ethical and scientific quality standard for designing, conducting, recording and reporting trials that involve the participation of human participants that has become the leading international guideline for the conduct of clinical trials.

the formal proof of efficacy, although they may contribute to the total body of relevant evidence."[48]

111.    Regardless, Defendants manipulated the results of the Pilot Study to suggest statistical significance.  A clinical protocol describes how a clinical trial will be conducted and ensures the safety of the trial subjects and integrity of the data collected.

112.    The clinical protocol for the Pilot Study, titled "Effect of IND 6 on Muscular Strength, Endurance and Body Composition" is not publically available and is in the sole possession of the Gencor Defendants.  This clinical study has been produced in other litigation and has been the subject of an expert report therein. Plaintiffs' counsel base the allegations regarding the clinical protocol of the Pilot Study on information and belief based thereon, and believe that production and independent analysis of the clinical protocol will provide evidence to support each allegation regarding the clinical protocol for the Pilot Study alleged herein.

113.    The clinical protocol for the Pilot Study defines the "primary objectives" of the Pilot Study as (a) "To determine the effects of IND 6 [Testofen] on muscle strength and endurance during eight weeks of resistance exercise," and (b) "To evaluate safety of the test supplement."

114.    Effect(s) of Testofen on testosterone levels is not a primary objective of the Pilot Study.

115.    Rather, the protocol defines the "**secondary objectives**" of the Pilot Study:  (a) "To determine the effects of the ingestion of IND 6 on muscle size during eight weeks of resistance exercise;" (b) "To determine the effects of ingestion of IND 6 on body composition

---

[48] http://www.ich.org/fileadmin/Public_Web_Site/ICH_Products/Guidelines/Efficacy/E9/Step4/E9_Guideline.pdf (last visited Sept. 3, 2015).

during eight weeks of resistance exercise;" and (c) "**To assess effect of IND 6 on serum testosterone (total and free) and prolactin levels**."

116.    The protocol provides that "Primary efficacy will be assessed on the basis of the following parameters" of "Muscular Strength and Endurance," which include: (a) "Change in 1-RM Bench Press;" (b) "Change in 1-RM Leg Extension;" (c) "Change in Bench Press repetitions at 80% of 1-RM at baseline;" and (d) "Change in Leg Extension repetitions at 80% of 1-RM at baseline."

117.    The protocol states under "Clinical Efficacy Assessments" that "Secondary efficacy will be assessed on the basis of the following parameters: (a) Muscle size – (i) Change in thigh, maximal girth, inferior to the gluteal fold, (ii) Change in flexed arm: maximal girth at mid upper arm, elbow flexed and muscle contracted, (iii) Change in shoulders: across the maximal protrusion of the deltoids, (iv) Change in chest: mid-tidal volume," and (b) "Body Composition – (i) Change in Fat-Free Maxx, (ii) Change in Percent Body Fat, (iii) Change in Fat Mass, and (iv) Change in Body Weight." Testosterone (total or free) is not listed as a parameter.

118.    Instead, the protocol states separately under "Laboratory Efficacy Assessments" that "Secondary efficiency will be assessed by measuring changes from baseline in serum testosterone (total and free) and prolactin levels after 8 weeks."

119.    Thus, according to the protocol, the effect of Testofen on testosterone levels is <u>not</u> a primary objective of the Pilot Study; rather it is <u>one of three secondary objectives</u>. Further, the effect of Testofen on testosterone levels is <u>not</u> one of four primary outcome variables; rather it is <u>one of many secondary outcome variables analyzed</u>.

120.    In human clinical trials for efficacy, statistical significance is attained when a p-value is less than the significance level. The level is traditionally at 5 percent. Hence, statistical

significance is usually expressed as a standard alpha or "$p<0.05$." The greater the number of variables being analyzed from a single trial, the greater the likelihood of a false positive result, known as a "type I error," unless a corrective statistical technique is applied.

121.    The ICH's *Harmonised Tripartite Guideline, Statistical Principles for Clinical Trials, E9* (Feb. 4, 1998) (the "ICH Guideline") sets forth principals for the statistical analysis of human clinical trials. Guidance promulgated by ICH has been adopted by regulatory bodies of the United States, European Union and Japan. *See* http://www.fda.gov/ScienceResearch /SpecialTopics/RunningClinicalTrials/GuidancesInformationSheetsandNotices/ucm219488.htm (last visited Sept. 3, 2015).

122.    Section 5.6 of the ICH Guideline states[49]:

> When multiplicity is present, the usual frequentist approach to the analysis of clinical trial data may necessitate an adjustment to the type I error. Multiplicity may arise, for example, from multiple primary variables …. In confirmatory analyses, any aspects of multiplicity which remain after steps of this kind have been taken should be identified in the protocol; adjustment should always be considered and the details or any adjustment procedure or an explanation of why adjustment is not thought to be necessary should be set out in the analysis plan.

123.    Gencor Defendants made publicly available three versions of the Pilot Study on the "proven" effects of Testofen in increasing free testosterone levels: (1) Testofen Human Clinical Trial, Copyright 2006 by Gencor Pacific, Inc. (the "2006 Report") (*Exh. D*); (2) Testofen Human Clinical Study for Free Testosterone & Muscle Mass Boosting, Copyright 2008 by Gencor Nutrients (the "2008 Report") (*Exh. E*); and (3) Testofen Human Clinical Study for Free Testosterone & Muscle Mass Boosting, Copyright 2013 by Gencor Nutrients, Inc. (the "2013 Study") (*Exh. F*).  The 2013 version is a duplicate of the 2008 Report.

---

[49] http://www.ich.org/fileadmin/Public_Web_Site/ICH_Products/Guidelines/Efficacy/E9/Step4/E9_Guideline.pdf (last visited Sept. 3, 2015).

124.     The 2006 Report indicates that the trial is an exploratory study ("this trial is designed to explore …") on the efficacy and safety of Testofen. (*Exh. D* at 4). It further states that the primary objective of the study is "to determine the effects of TESTOFEN on free testosterone and body composition."

125.     However, the primary objective indicated in the 2006 Report is contrary to the protocol of the Pilot Study, which stated that the primary objective of the Pilot Study is to determine the effects of Testofen on muscle strength and endurance. The 2006 Report fails to mention that change in free testosterone levels is one of many secondary outcome variables analyzed.

126.     The 2006 Report presents the following pretreatment and post treatment levels of free testosterone. (*See Exh. D* at 6). While the 2006 Report does not make a claim of statistical significance, it claims that "TESTOFEN has positive effects on the biologically active free testosterone secretion."

| Results | Free testosterone pg/ml |
|---|---|
| Pretreatment levels | 17.76 |
| Post treatment levels | 35.29 |
| Total Increase | 17.55 |
| % of Increase | 98.81% |

127.     However, in the reported results, the investigators make no distinction between primary and secondary outcome measures or explanatory variables.  Significantly, though, secondary variables/outcomes and analyses based upon them are performed for heuristic, exploratory purposes only and are not considered as evidence for the efficacy of a therapy.  Data is collected and analyzed on secondary outcomes which are other areas of interest in the study but these outcomes are not accepted as evidence for or against the efficacy of a medical therapy. Rather they are explanatory in nature and often used to suggest further areas in need of

exploration in future work.  None of these secondary analyses would be considered as evidence for the efficacy of the Company's product by research bodies such as the FDA, the National Institute of Health ("NIH"), or a reputable peer reviewed journal.  Under normal protocol, a second Randomized Controlled Trial ("RCT") would need to be conducted in which these secondary outcomes would then need to be specified as primary endpoints and the entire trial repeated.

128.    The 2008 Report identifies the primary "end point" as "To determine the effect of TESTOFEN® on safety, anabolic activity, blood testosterone, immune function during 8 weeks of intense resistance exercise" and stated that "blood testosterone both total and free" is one of three primary efficacy parameters (*See Exh. E* at 3).

129.    The primary objective indicated in the 2008 Study is contrary to the protocol, which stated that the primary objective of the Pilot Study is to determine the effects of Testofen on muscle strength and endurance. The 2008 Report fails to mention that on the change in free testosterone levels is one of many secondary outcome variables analyzed.

130.    The 2008 Report presents the following results for free testosterone levels and concludes that "TESTOFEN group has significant increase in Free Testosterone (p<0.05) compared to Placebo." (*Exh. E* at 9, 11).

| Parameters | Testofen | Placebo | |
|---|---|---|---|
| Pre Treatment | 17.76 | 21.30 | |
| Post Treatment | 35.29 | 31.70 | |
| P value | 0.0001 | 0.014 | |
| Percentage change | 96 | 48* | P Value < 0.5 |

131.    Because the change in free testosterone levels was not included as a primary outcome variable in the Pilot Study (as set forth in the protocol), but rather one of many secondary outcome variables, the threshold for statistical significance must be adjusted upward

to reflect this multiplicity of comparisons under universally accepted principles of statistical analysis or so-called Type I error, the probability that a null hypothesis is rejected when the null hypothesis is actually true. The greater the number of statistical tests performed, the greater the probability that one or more of them will yield a statistically significant result by chance alone. One consequence of conducting multiple analyses is that it increases the likelihood of false positive results, making it possible for an investigator to choose the most favorable result from among many analyses that have been performed.  Regulatory agencies[50] and biostatisticians[51] and scientific journals often advocate the use of appropriate adjustments to control the overall probability of a Type I error when multiple endpoints are included in clinical trials.  The Gencor Defendants did not do this or explain why any adjustments were unnecessary.   Rather, appropriate adjustments would result in statistically insignificant P Value, rendering the efficacy claims made by Defendants false, misleading and deceptive.

132.   Force Factor incorporated results for free testosterone levels from both 2006 Report and 2008 Report in its digital advertisements (*see* paragraphs 67, 69, 105) to falsely represent the ability of Testofen to boost testosterone levels.

133.   Further, additional clinical studies on Fenugreek seed extract show no ability to boost testosterone levels or increase sex drive in the human male. In fact, a study titled *Fenugreek Extract Supplementation Has No effect on the Hormonal Profile of Resistance Trained Males* concluded that "supplementation of fenugreek extract does not appear to affect

---

[50] U.S. Department of Health and Human Services. Guidance for industry: E9 statistical principles for clinical trials. Rockville, MD: Office of Training and Communication, Food and Drug Administration, 1998.
[51] Bauer P, Chi G, Geller N, Gould AL, Jordan D, Mohanty S, et al. Industry, government, and academic panel discussion on multiple comparisons in a ''real'' phase three clinical trial. J Biopharm Stat 2003;13:691–701.

hormonal status in resistance trained males and shows no anabolic potential as has been purported."[52]

134.    Further, a human clinical trial that compared Testofen to placebo found that Testofen has no effect on testosterone levels.[53] This study, also cited to by Gencor to support its claim that Testofen promotes sexual desire and vitality, reported "*Serum prolactin and testosterone levels remained within the reference range.*" In simple terms, this study reveals that Testofen did not raise testosterone levels.  Moreover, according to the study, men who received the Testofen reported greater feelings of sexual arousal, orgasm, libido, well-being, energy and muscular strength, but no change in mood was reported.  No explanation was given for the fact that the men in the study reported no change in mood, yet they reported better "well-being." Additionally, this study did not directly measure strength or energy levels; rather, the men just reported that they felt stronger and had more energy.

135.    At least three other studies have similarly shown that fenugreek extract has no effect on free testosterone levels.

136.    A 2009 study investigating the potential anabolic effects of fenugreek extract supplementation in conjunction with a controlled resistance training program observed no significant effects for groups or interactions for free testosterone.[54] Thus, the study concluded that fenugreek extract has no effect on free testosterone levels.

137.    Another 2009 study found that "[s]upplementation of fenugreek extract resulted in a decrease in serum DHT levels in comparison to placebo. However, other anabolic and

---

[52] B. Brandon *et al.*, (2009) "Fenugreek Extract Supplementation Has No effect on the Hormonal Profile of Resistance-Trained Males," *International Journal of Exercise Science: Conference Proceedings*: Vol. 2: Iss. 1, Article 13, *available at* http://digitalcommons.wku.edu/ijesab/vol2/iss1/13

[53] E. Steels, et al., (2011) Physiological Aspects of Male Libido Enhanced by Standardized Trigonella foenum-graecum Extract and Mineral Formulation, *Phytotheropy Res*.

[54] B.Bushey, et al., Fenugreek Extract Supplementation Has No Effect on the Hormonal Profile of Resistance-Trained Males, *Int. J. Exerc. Sci*. 2(1): S13. 2009.

metabolic hormone analyses were not affected by supplementation."   Accordingly, the authors "conclude that in conjunction with structured resistance training, supplementation of fenugreek extract does not appear to affect hormonal status in resistance trained males and shows no anabolic potential as has been purported." [55]

138.   Similarly, a 2010 study evaluated the effects of Fenugreek supplementation on strength and body composition, and results demonstrated "no between or within group differences were observed for any of the measured hormone variables, except for free testosterone." However, the authors pointed out that the between group different "has limited relevance due to the fact that it did not change significantly over time."   The authors concluded based on the results that "commercially available supplement lacks the potential for altering hormone values in combination with a resistance training regimen.. [56]

139.   Testofen is neither effective at boosting testosterone levels, nor a user's sex drive or libido nor does it increase lean muscle mass as claimed by Defendants on various advertisements and packaging on Test X180 Products.

140.   Moreover, there are no credible scientific evidence or studies showing that any other ingredient in the Test X180 Products — including but not limited to Horney Goat Weed Extract, Green Tea Leaf Extract, Avena Sativa Extract, Green Coffee Extract, and White Tea Extract — are "clinically proven" to increase testosterone levels, increase lean muscle mass, or boost a user's sex drive, sexual performance and/or libido.

---

[55] *See, e.g.,* C. Poole, *et al.*, (2009) Effects of TESTOSURGE supplementation on strength, body composition and hormonal profiles during an 8-week resistance training program, *Journal of International Society Sports Nutrition.*
[56] C. Poole *et al.*, (2010), The effects of commercially available botanical supplementation on strength, body composition, power output, and hormonal profiles in resistance-trained males, *Journal of International Society Sports Nutrition.*

141.   In sum, Defendants relies on results from studies that, as demonstrated by Defendants' own descriptions cannot support the Test X180 Products claims.   Not surprisingly, therefore, the actual experiences of Plaintiffs using Test X180 Products also demonstrate that these products do not deliver the results represented and/or promised by Defendants.   Simply stated, Defendants' marketing campaign is false, misleading and deceptive and/or contain material omission.

**Plaintiffs' Purchases and Experiences with Defendants' Products**

**Plaintiff Daniel Camey**

142.   Within the class period, Plaintiff Camey purchased Test X180 Products manufactured, marketed or sold by Defendants described and at issue in this Complaint, including: one (1) Test X180 Ignite in or around September of 2013 from a GNC store located on Philadelphia Street, in Chino, California for approximately $60.00 to $70.00.

143.   Plaintiff Camey purchased the Test X180 Products after viewing various advertisements concerning the Test X180 Products, including website advertisements and/commercials, and in-store advertisements stating Test X180 Products were "proven" to, among other benefits, boost testosterone levels.   Moreover, that as a result of a purported boost in testosterone levels, Test X180 Ignite would, among other things, "help increase lean muscle mass and jumpstart [his] energy, libido, and performance."   Further, prior to purchase, Plaintiff Camey conducted internet searches and read and relied on information in online reviews that conveyed the very misinformation that Gencor put into the public sphere with the intent that purchasers would rely.   He also conducted internet searches from which he read reviews on various vitamins and supplements websites and was directed to GNC's website after performing a Google webs search.   Prior to purchasing, Plaintiff Camey visited GNC website and reviewed

various testosterone boosting products, including Test X180 Ignite.  Plaintiff viewed various advertisements concerning the Test X180 Products prior to the time of purchase and understood them as a representation and warranty by Defendants that the Test X180 Products were effective for these purposes and "proven" to boost testosterone levels.  He relied on these representations and warranties in deciding to purchase the Test X180 Products, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Test X180 Products if he had known that it was not in fact, proven to provide the aforementioned benefits.  Plaintiff used Test X180 Ignite pursuant to and consistent with the instructions on its respective packaging, but Test X180 Ignite did not work as advertised for the reasons provided herein.  The Test X180 Products were useless to Plaintiff Camey, who would not have purchased the Test X180 Products or would not have paid as much for the products had he known that they were not effective.[57]

### Plaintiff Raymond Alvandi

144.    Within the class period, Plaintiff Alvandi purchased Test X180 Products manufactured, marketed or sold by Defendants described and at issue in this Complaint, including: one (1) Test X180 Ignite in or around January of 2014 from a GNC store near his home in Los Angeles, California for approximately $79.95.[58]

145.    Mr. Alvandi purchased the Test X180 Products after viewing the various advertisements concerning the Test X180 Products, including product packaging and labeling, website advertisements and/or commercials, and in-store advertisements stating Test X180

---

[57] Plaintiff would still be interested in purchasing the product in the future if it were advertised properly and/or truthfully.

[58] Plaintiff Alvandi previously participated in a free trial/sample program and was subsequently and unknowingly enrolled in an "autoship" program, whereby Defendant automatically charged Plaintiff's credit card without his consent.  As a result of this improper conduct, Plaintiff Alvandi returned the product and ultimately received a refund after much difficulty.

Products were "proven" to, among other benefits, boost testosterone levels. Moreover, that as a result of a purported boost in testosterone levels, Test X180 Ignite would, among other things, "help increase lean muscle mass and jumpstart [his] energy, libido, and performance." Further, prior to purchase, Plaintiff Alvandi conducted internet searches and read and relied on information in online reviews that conveyed the very misinformation that Gencor put into the public sphere with the intent that purchasers would rely. Prior to purchasing Test X180 Ignite, Plaintiff Alvandi also visited GNC website and reviewed various testosterone boosting products including the products at issue. Plaintiff viewed various point of purchase advertisements concerning the Test X180 Products prior to the time of purchase and understood them as a representation and warranty by Defendants that the Test X180 Products were effective for these purposes and "proven" to boost testosterone levels. He relied on these representations and warranties in deciding to purchase the Test X180 Products, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Test X180 Products if he had known that it was not in fact, proven to provide the aforementioned benefits. Plaintiff used Test X180 Ignite pursuant to and consistent with the instructions on its respective packaging, but Test X180 Ignite did not work as advertised for the reasons provided herein. The Test X180 Products were useless to Plaintiff Alvandi, who would not have purchased the Test X180 Products or would not have paid as much for the products had he known that they were not effective.[59]

---

[59] Plaintiff would still be interested in purchasing the product in the future if it were advertised properly and/or truthfully.

E.      **The Test X180 Products' Aphrodisiac Claims Are Unlawful**

146.    Furthermore, the FDA considers labeling claims on sexual enhancement products ("aphrodisiacs") containing plant extracts, such as those in the Test X180 Products, to be either "false, misleading, or unsupported by scientific data." 21 C.F.R. § 310.528.

147.    The labeling described herein, including but not limited to: "Boost Sex Drive and Libido," "Enhance Performance," "All-in-One Male Vitality Supplement," and "heightens sexual appetite for a more satisfying love life" alone and in context with other express and implied labeling claims evidence Defendants' intended use of the Test X180 Products as aphrodisiacs, to arouse or increase sexual desire or improve sexual performance.

148.    Pursuant to Title 21 of the Code of Federal Regulations, Part 310.528 (21 CFR § 310.528) any over the counter ("OTC") drug product that is labeled, represented, or promoted for use as an aphrodisiac, like the Test X180 Products, is regarded as a "new drug" within the meaning of section 201(p) of the FDCA (located at 21 U.S.C. § 355(p)).

149.    The FDCA requires any new drug to have an application approved by the Food and Drug Administration ("FDA") before the drug can be marketed to the public, and further that the drug's label be approved by the FDA prior to marketing or selling the drug to the public.  *See generally*, *id.*; 21 U.S.C. §§ 355(a), (b) [New Drug Application], (j) [Abbreviated New Drug Application, for generic drugs].

150.    The Test X180 Products violate Section 505(a) of the FDCA because the adequacy of the labeled directions for its "aphrodisiac" uses have not been approved by the FDA

prior to the Products being marketed to the public (*see* 21 U.S.C. § 355(a)).[60]   Accordingly, the

Products are misbranded under section 502(f)(1) of the FDCA (located at 21 U.S.C. § 352).

151.    Further, as to all of the ingredients in the Test X180 Products, there is a lack of

adequate data to establish general recognition of the safety and effectiveness of any of these

ingredients, or any other ingredient, for OTC use as an aphrodisiac. 21 C.F.R. § 310.528.

Labeling claims for aphrodisiacs for OTC use are false, misleading, or unsupported by scientific

data.  *Id.*  Thus, based on the evidence currently available, any OTC drug product containing

ingredients for use as an aphrodisiac, including the Test X180 Products, cannot be generally

recognized as safe and effective.  *See id.*

152.    California Health and Safety Code, Division 104, Part 5, contains the Sherman

Food, Drug, and Cosmetic Law (the "Sherman Law"). Cal. Health & Safety Code §§ 109875, *et*

*seq*.  The Sherman Law is explicitly authorized by the FDCA.  21 U.S.C. § 343-1.

153.    The Sherman Law defines a "drug" as "any article other than food, that is used or

intended to affect the structure or any function of the body of human beings or any other

animal." Cal. Health & Safety Code § 109925(c).

154.    Test X180 Products are marketed with structure-function claims, indicating that

the products are intended to affect the structure or function of the human body, thus rendering

Test X180 Products drugs under the Sherman Law.

155.    A new drug may not be legally marketed without prior approval from the FDA;

Test X180 Products are unapproved new drugs that are accordingly misbranded under the

California Sherman Law.  Cal. Health & Safety Code §§ 110100, 110105, 110110, 110111.

---

[60] In addition to proving effectiveness, the manufacturer of a new drug must also prove the drug's safety, sufficient
to meet FDA standards.  21 U.S.C. § 355(d).

156.    Defendants' marketing and promotion of the Text X180 Products was supported by false and misleading claims that contain material omissions and misrepresentations and are in this respect misbranded under identical California and federal laws.

157.    When purchasing Text X180 Products, Plaintiffs and Class Members were seeking products that would provide the benefits and possessed the efficacy and characteristics as Defendants marketed, promised, represented and warranted.

158.    Plaintiffs and Class Members purchased Test X180 Products believing each had the qualities Plaintiffs and Class Members sought based on Defendants' deceptive labeling and marketing, but the Test X180 Products were actually unacceptable to them because they did not possess the benefits, efficacy, and characteristics as advertised.

159.    Plaintiffs, like all reasonable consumers and Class Members, considered a label's compliance with federal law a material factor in his purchasing decisions. Plaintiffs are generally aware the federal government carefully regulates OTC products and therefore has come to trust that information conveyed on packaged OTC product labels as truthful, accurate, complete, and fully in accordance and compliance with the law.  As a result, Plaintiffs and Class Members trust they can compare competing products on the basis of their labeling claims in order to make a purchasing decision.

160.    Defendants were marketing and advertising Test X180 Products with claims in violation of the FDCA, rendering such Products misbranded under the Sherman Law. Misbranded products cannot be legally sold and are legally worthless.

161.    Plaintiffs, like all reasonable consumers and Class Members, would not purchase an OTC product they knew was misbranded under federal law, *see* 21 U.S.C. § 352, which the federal government prohibits selling, *id*. § 331, and which carries with its sale criminal penalties,

*id.* § 333.  *See also* Cal. Health & Safety Code §§ 110100, 110105, 110110, 110111.  Plaintiffs did not know, and had no reason to know, that Defendants' Test X180 Products were misbranded.

162.    Further, Plaintiffs, like all reasonable consumers and Class Members would not have purchased an OTC product they knew was an illegally marketed new drug for which the FDA has not determined its safety and efficacy.  In light of the foregoing, reasonable consumers, including Plaintiffs and other Class Members, were and are likely to be deceived by Defendants' advertising and marketing practices as detailed herein.

163.    In purchasing the Test X180 Products, Plaintiffs and Class Members reasonably relied upon various representations Defendants made on the Products' packaging and their prevalent advertising campaign, as described herein.

164.    At all times relevant herein, Defendants had a duty to disclose additional and/or complete, accurate information to purchasing consumers, to correct all misunderstandings its omissions and misrepresentations created in the minds of those consumers.

165.    Absent misrepresentations and omissions described herein, which were and are material to the average consumer, Plaintiffs and Class Members would not have purchased the Test X180 Products and certainly would not have paid as much for the Products as they did.

166.    Plaintiffs and the Class continue to be exposed to false, deceptive, and unlawful labeling claims concerning Test X180 Products in the future when they visit retail stores for male sexual enhancement products and testosterone boosters unless Defendants agree, or are enjoined, to change the Products' labeling in response to Plaintiffs' claims as set forth herein and in Plaintiffs' CLRA notice letters.

167.    Instead of receiving a product that had the benefits, advantages, endorsements, proof, and characteristics as advertised, Plaintiffs and other Class Members received worthless products because the Test X180 Products (1) do not work; (2) causes no effect or effects reverse of that advertised; and (3) do not possess the characteristics, benefits, endorsements, and proof of efficacy, as advertised by Defendants.

168.    Plaintiffs and Class Members lost money as a result of Defendants' deception in that Plaintiffs and Class Members did not receive what they had paid for.

169.    Plaintiffs and Class Members altered their position to their detriment and suffered damages in an amount equal to the amount they paid for the Test X180 Products over the relevant statute of limitations period.

### F.    Defendants' False and Misleading Claims are Material

170.    The representations at issue are ubiquitous.  In commercial videos, in retail stores, and on Defendants' respective websites, Defendants make the same representations about Testofen and the Test X180 Products, namely that the product (which contains Testofen) is an effective testosterone booster and that the claims are backed by clinical studies and/or research. Moreover, every package of Test X180 Products contains these representations.

171.    All of Defendants' claims challenged herein relate to matters that are material and important to a consumer's purchasing decision for they concern core claims about the Products which are likely to and did influence a consumer's purchase of the Test X180 Products.

172.    Defendants' marketing, advertising, and packaging materials intended to, and did, induce Plaintiffs and Class Members to rely upon Defendants' representations that the Test X180 Products were effective for their intended use and in the way described.  These representations

were a substantial factor in causing Plaintiffs and Class Members to purchase Test X180 Products over an effective testosterone booster available in the marketplace.

173.    At the time of purchase, Plaintiffs and Class Members were unaware that (1) Defendants' claims that the Test X180 Products could boost testosterone levels were false, misleading and deceptive, and (2) Test X180 Products are not proven effective for their intended use.

174.    If Plaintiffs and Class Members had been aware of the true facts concerning the Test X180 Products, Plaintiffs and Class Members would not have purchased the Products. Plaintiffs and Class Members have been injured in fact and suffered out of pocket losses. Plaintiffs and Class Members therefore seek a refund and/or rescission of the transaction and all further equitable and injunctive relief as provided by applicable law.

## CLASS ACTION ALLEGATIONS

175.    Pursuant to Rules 23(a), (b)(3) and/or (b)(2) of the Federal Rule of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a nationwide consumer class (the "Class" or "Nationwide Class") initially defined as follows:

> All persons in the United States, who within the relevant statute of limitations period, purchased the Test X180 Products, for personal or household use and not for resale.  Excluded from the Class are (i) governmental entities, (ii) Defendants, any entity in which the Defendants have a controlling interest, their employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies, including parent corporations, class counsel and their employees; and (iii) judicial officers and their immediate family members and associated court staff assigned to this case.

176.    Pursuant to Rules 23(a), (b)(3) and/or (b)(2) of the Federal Rule of Civil Procedure, Plaintiffs Camey and Alvandi also bring this action on behalf of themselves and a sub-class[61] of California consumers (the "California Sub-Class") initially defined as follows:

> All persons in the State of California, who within the relevant statute of limitations period, purchased the Test X180 Products, for personal or household use and not for resale.   Excluded from the California Sub-class are (i) governmental entities, (ii) Defendants, any entity in which the Defendants have a controlling interest, their employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies, including parent corporations, class counsel and their employees; and (iii) judicial officers and their immediate family members and associated court staff assigned to this case.

177.    Members in the Class and California Sub-class will be jointly referred to as "Class Members."

178.    The requirements of Federal Rule of Civil Procedure 23 are satisfied:

179.    <u>Numerosity</u>: The proposed Class and Sub-class are so numerous that individual joinder of all their members is impracticable.   Due to the nature of the trade and commerce involved, Plaintiffs aver the total number of Class members is at least in the tens of thousands of persons in the United States, including in the Commonwealth of Massachusetts and the State of California.   While the exact number and identities of Class Members are unknown at this time, such information can be ascertained through appropriate investigation, discovery or Class definition.   The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

180.    <u>Commonality</u>: There is a well-defined community of interest in the questions of law and fact involved affecting Plaintiffs and Class Members.   The common questions of fact and law include, but are not limited to, the following:

---

[61] Plaintiffs reserve the right to amend all lass and Subclass definitions at class certification based on additional research, factual investigations, discovery, and/or changes in federal or state law.

(a)     Whether the Test X180 Products are effective at boosting testosterone;

(b)     Whether the Test X180 Products are effective at increasing sex drive and libido;

(c)     Whether the Test X180 Products are clinically "proven" to be efficacious;

(d)     Whether the claims discussed above are false, misleading, deceptive or reasonably likely to deceive an average consumer;

(e)     Whether Defendants violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*;

(f)     Whether Defendants breached any express warranties made to Plaintiffs and Class Members;

(g)     Whether Defendants breached an implied warranty of merchantability made to Plaintiffs and Class Members;

(h)     Whether Defendants were unjustly enriched by its conduct;

(i)     Whether Defendants' alleged conduct violates public policy;

(j)     Whether the alleged conduct constitutes violations of the laws asserted herein;

(k)     Whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief; and

(l)     The method of calculation and amount of restitution or damages to the Class and Sub-class.

181.    Typicality: Plaintiffs' claims are typical of the claims of the proposed Class and Sub-class because Plaintiffs and Class Members have been similarly affected by the Defendants' common course of conduct as they all relied on Defendants' representations concerning Test X180 Products and purchased the Test X180 Products based on those representations. Plaintiffs are not different in any relevant respect from other Class Members and the relief sought is common to the Class and Sub-class.

182.    Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class and Sub-class. Plaintiffs have retained counsels with substantial experience in handling complex class action litigation in general and scientific claims. Plaintiffs and their

counsels are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

183. <u>Superiority</u>: Plaintiffs and Class Members suffered and will continue to suffer harm as a result of Defendants' unlawful and wrongful conduct. This class action device is superior to other available methods for the fair and efficient adjudication of the present controversy. Even if individual Class Members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which individual litigation would proceed. Given the small size of each Class Member's claims in this situation, class treatment is not merely superior, but is the only manner in which to ensure fair and efficient adjudication of the action. Furthermore, individual actions present the potential for inconsistent or contradictory judgments, which could be dispositive of at least some of the issues and interests of other members not party to the individual actions. Hence, such inconsistencies or contradictions would impair or impede such members' ability to protect their interests, and would establish incompatible standards of conduct for the party opposing the class. By contrast, a class action presents far fewer management difficulties and provides the single adjudication, economies of scale, and comprehensive supervision by a single court.

184. Questions of law and fact common to the Class and Sub-class predominate over any questions affecting only individual Class Members. Injuries sustained by Plaintiff and Class Members flow, in each instance, from a common nucleus of operative facts i.e., Defendants' misconduct. In each case, Defendants manufactured, marketed, distributed or sold Test X180 Products and deceived Plaintiffs and Class Members as to the benefits these Products provide.

185. In the alternative, the prerequisites for maintaining a class action for equitable relief under Fed. R. Civ. P 23 (b)(2) are met because Defendants acted or refused to act on

grounds generally applicable to the Class and Sub-class, thereby making final injunctive relief or corresponding declaratory relief and damages as to Test X180 Products appropriate with respect to the Class and Sub-class as a whole.  In particular, Defendants misrepresented or failed to disclose the true nature of Test X180 Products being marketed and distributed, as detailed herein, through misrepresentations and omissions on the labeling and various advertising materials.

186.    Retrospective injunctive relief would seek a recall of the Products' false, deceptive and unlawful labeling and benefit the Classes equally as a whole. Prospective injunctive relief would ensure that Class Members are only exposed to lawful, truthful and non-misleading advertising of the Products in the future[62], which will also benefit each Class Member in equal but indivisible measure

## CAUSES OF ACTION

### COUNT I
### (Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*)

187.    Plaintiffs and Class members re-allege and incorporate by reference each allegation set forth above and further allege as follows.

188.    Plaintiffs bring this Count individually and on behalf of the members of the Nationwide Class against all Defendants.

189.    Test X180 Products are consumer products as defined in 15 U.S.C. § 2301(1).

190.    The amounts in controversy of each Plaintiff's claims are more than the sum or value of twenty-five ($25) dollars.

191.    Plaintiffs and Class Members are consumers as defined in 15 U.S.C. § 2301(3).

---

[62] This is particularly applicable as Plaintiffs would be interested in purchasing the Test X180 Products in the future if Defendant corrected the Products and the misrepresentations became true.

192.    At all relevant times, Defendants are supplier(s) and warrantor(s) as defined in 15 U.S.C. § 2301 (4) and (5).

193.    In connection with the sale of Test X180 Products, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), which expressly warranted that Test X180 Products will (i) boost testosterone levels, (ii) boost sex drive and libido, and (iii) is effective for the Products' intended use. Moreover, Defendants claimed that a user could "Burn Fat and Build Muscle" by using Test X180 Products.

194.    Defendants breached these warranties because Test X180 Products are not effective for their intended use and have never been proven effective by competent and reliable scientific evidence to boost testosterone levels or boost sex drive and libido.   In fact, Test X180 Products do not conform to the above express representations because each of the representation is false and misleading.  Additionally, clinical studies discussed herein refute these warranties.

195.    Additionally, Defendants impliedly warranted, as defined in 15 U.S.C. § 2301(7), in connection with the sale of Test X180 Products that the Products were of merchantable quality.

196.    Defendants breached the warranty implied in the contract for the sale of Test X180 Products in that the Test X180 Products are not effective for boosting testosterone levels or sex drive and libido, or for the Products' intended use.  Thus, Test X180 Products could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose in that they are not generally recognized among qualified experts as safe and effective for the advertised purposes.  Furthermore, the Test X180 Products do not conform to the promises or affirmations of fact made in the advertisements, packaging, and labeling of the Products.  As a

result, Plaintiffs and Class Members did not receive the goods as impliedly warranted by Defendants to be merchantable.

197.    By reason of Defendants' breach of their express and implied warranties, Defendants violated the statutory rights owed to Plaintiffs and Class Members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, thereby damaging Plaintiffs and Class Members.

198.    Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's breach because they would not have purchased Test X180 Products if the true facts had been known.

199.    Prior to filing this action, Plaintiffs, by and through their counsels, provided Defendants with written notice of their claims pursuant to 15 U.S.C. § 2301(e) and any laws requiring pre-suit demand and notice.

## MASSACHUSETTS

### COUNT II
### (Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A)

200.    Plaintiffs and Class Members re-allege and incorporate by reference each allegation set forth above and further allege as follows.

201.    Plaintiffs bring this Count individually and on behalf of the members of the Nationwide Class against Defendant Force Factor.

202.    Plaintiffs and Class Members are persons.

203.    Defendant was engaged in trade or commerce.

204.    Plaintiffs and the Class entered into consumer transactions with Defendant.

205.    Defendant engaged in unfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices, in the conduct of trade or commerce by falsely advertising and marketing Test X180 Products.

206.    Defendant's conduct at issue in this Complaint took place primarily and substantially within the Commonwealth of Massachusetts.

207.    Defendant's acts, practices, and conduct were willful and knowing violations and invaded the rights of Plaintiffs and the Class to be free from deceptive business practices.

208.    As a proximate and foreseeable consequence of Defendant's violations, Plaintiffs and the Class suffered damages in the amount of the total purchase price of the Test X180 Products.

209.    Plaintiffs made written demands for relief from each Defendant more than thirty days before naming them as a party and/or filing a Complaint.

## <u>CALIFORNIA</u>

### COUNT III
### (Breach of Express Warranty, Cal. Com. Code § 2313)

210.    Plaintiffs and Class Members re-allege and incorporate by reference each allegation set forth above and further allege as follows.

211.    Plaintiffs bring this Count individually and on behalf of the members of the California Sub-Class against all Force Factor and GNC Defendants.

212.    Defendants, as the manufacturer, marketer, distributor or seller, expressly warranted by affirmation of fact or promise in connection with the sale of Test X180 Products, that Test X180 Products will (i) boost testosterone levels, (ii) boost sex drive and libido, and (iii) are effective for the Products' intended use. Moreover, Defendants claimed that a user could "Burn Fat and Build Muscle" by using Test X180 Products.

213.    Defendants' express warranties as described herein were made part of the basis of the bargain when Plaintiffs and Sub-class Members purchased Test X180 Products because Plaintiffs and Sub-Class Members understood Defendants' representations to mean that Test X180 Products could boost testosterone levels, sex drive and libido, are effective for the Products' intended use, or burn fat and build muscle.  These representations had an influence on consumers' decisions in purchasing Test X180 Products.  These representations had an influence on consumers' decisions in purchasing Test X180 Products.

214.    Defendants breached their express warranties because Test X180 Products do not conform to the above express representations. In fact, Test X180 Products do not conform to the above express representations because each of the Express Warranties is false misleading and deceptive.

215.    Plaintiffs and Class Members were injured as a direct and proximate result of Defendants' breach because they would not have purchased Test X180 Products if the true facts had been known.

## COUNT IV
### (Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2313)

216.    Plaintiffs and Class Members re-allege and incorporate by reference each allegation set forth above and further allege as follows.

217.    Plaintiffs bring this Count individually and on behalf of the members of the California Sub-Class against Force Factor and GNC Defendants.

218.    Defendants, as the designer, manufacturer, marketer, distributor, and seller, impliedly warranted that Test X180 Products were fit for their ordinary purpose for which the goods are used in that the Test X180 Products would function as effective testosterone boosters.

Defendants did so with the intent to induce Plaintiffs and Class Members to purchase Test X180 Products.

219. In reliance upon Defendants' skill and judgment and the implied warranties discussed above, Plaintiffs and Class Members purchased Test X180 Products for use as a testosterone booster, and to increase sex drive and libido, burn fat and build muscle.

220. Defendants breached their implied warranties in the sale of Test X180 Products in that (i) the Products do not contain ingredients that will boost testosterone levels and therefore could not pass without objection in the trade under the contract description, (ii) the Products were not of fair average quality within the description, and (iii) the Products were unfit for their intended and ordinary purpose. As a result, Plaintiffs and Class Members did not receive the goods as impliedly warranted by Defendant to be merchantable.

221. Neither Plaintiffs nor Class Members altered Test X180 Products after purchase.

222. The Test X180 Products were defective when they left the exclusive control of Defendants.

223. Defendants knew Test X180 Products would be purchased and used without additional testing for efficacy by Plaintiffs and Class Members.

224. The Test X180 Products were defectively designed and unfit for their intended purpose, and Plaintiffs did not receive the goods as warranted. Had Plaintiffs and Class Members known the true facts, they would not have purchased the Test X180 Products.

225. Plaintiffs and Class Members were injured as a direct and proximate result of Defendants' breach because they would not have purchased Test X180 Products if the true facts had been known.

**COUNT V**
**(Unfair Competition Law, §§ 17200 *et seq*.)**

226.   Plaintiffs and Class Members re-allege and incorporate by reference each allegation set forth above and further allege as follows.

227.   Plaintiffs bring this Count individually and on behalf of the members of the California Sub-Class against all Defendants.

228.   This cause of action is brought pursuant to California Unfair Competition Law (the "UCL"), Bus. & Prof. Code § 17200, which prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

229.   For the reasons set forth in this Complaint, Defendants have engaged in "unlawful" business acts or practices by, among other things, making misrepresentations and omissions of material facts, as set forth more fully above, and violating, among other statutes, Cal. Health & Safety Code §§ 110100, 110105, 110110, 110111, and the common law. In the alternative, Defendants' acts, omissions, misrepresentations, practices, and non-disclosures as alleged herein constitute "unfair" or "fraudulent" business acts under the UCL.

230.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute "unlawful" business acts and practices in that Defendant's conduct violates the False Advertising Law, and the Consumer Legal Remedies Act.

231.   Defendants' conduct is further "unlawful" because it violates the Sherman Law, which incorporates provisions of the FDCA. *See id.* §§ 110110-110115. Defendants' conduct violates the FDCA and its implementing regulations in the following ways:

(a)   Defendants' deceptive statements violate 21 U.S.C. §§ 343(a) and 352, which deem a food or drug (including nutritional supplements) misbranded when the label contains a statement that is "false or misleading in any particular";

(b)     Defendants' deceptive statements violate 21 C.F.R. § 101.14(b)(3)(i), which mandates "substances" in dietary supplements consumed must contribute and retain "nutritive value," as defined under 21 C.F.R. § 101.14(a)(2)(3) when consumed at levels necessary to justify a claim;

(c)     Defendants' deceptive statements are *per se* false and misleading because the FDA has ruled there is a lack of adequate data to establish general recognition of the safety and effectiveness of any of the ingredients in the Test X180 Products, or any other ingredient, for OTC use as an aphrodisiac; and labeling claims for aphrodisiacs for OTC use are "either false, misleading, or unsupported by scientific data." 21 C.F.R. § 310.528(a);

(d)     Defendants' deceptive statements violate 21 CFR § 310.528(b), which mandates that any OTC product that is labeled, represented, or promoted for use as an aphrodisiac, like Test X180 Products, is regarded as a "new drug" within the meaning of 21 U.S.C. § 355(p), but Test X180 Products are neither approved nor do they conform to labeling requirements under the FDCA and its implementing regulations. Accordingly, Defendant's Products are misbranded under section 502(f)(1) of the FDCA; and

(e)     Defendants' Products also violates the FDCA because, as unapproved new drugs and aphrodisiacs, the Test X180 Products cannot be generally recognized as safe and effective in the absence of a new drug application as set forth in the FDCA and its implementing regulations. 21 C.F.R. § 310.528(a).

232.    The acts, omissions, misrepresentations, practices, and non-disclosures as alleged herein constitute "unfair" business acts and practices under the UCL. Defendants' conduct offends public policy against false advertising. Federal law states that an advertisement must be truthful, and not misleading. Defendants' conduct is also immoral, unethical, and unscrupulous

because it seeks to profit from male vulnerability with false or deceptive virility or aphrodisiac claims. Further, Defendants' statements are neither truthful nor backed by scientific evidence. Thus, the injuries suffered by Plaintiff and California Sub-Class Members outweigh any conceivable benefit to consumers or competition that may derive from Defendant's conduct.

233.    Plaintiff and California Sub-Class Members suffered lost money or property as a result of Defendants' UCL violations because they would not have purchased Test X180 Products if they knew the truth about Test X180 Products.

234.    In the alternative, Defendants' acts, omissions, misrepresentations, practices, and non-disclosures as alleged herein constitute "fraudulent" business acts and practices under the UCL. Defendants made false and misleading claims not only deceived Plaintiff and California Sub-Class Members, but also have the tendency to deceive the public, as detailed herein.

235.    Defendants' labeling, website and other advertisements, as described herein, were false, deceptive, and/or likely to deceive a reasonable consumer because Defendants falsely claim Test X180 Products boost testosterone levels, (ii) boost sex drive and libido, and (iii) are effective for the Products' intended use. In fact, Test X180 Products are not effective for their intended use and have never been proven effective by competent and reliable scientific evidence to dramatically boost testosterone levels.

236.    Defendants also omitted material information from the Products' advertising as described herein, such that if Plaintiffs and members of the Class had known those material facts, and the foregoing facts, they would not have purchased the Products.

237.    Plaintiffs and California Sub-Class Members were exposed to Defendants' marketing and advertising as alleged herein.

238.    Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, or fraudulent acts and practices, and to commence a corrective advertising campaign.

239.    Plaintiffs further seek an order for the disgorgement and restitution of all monies from the sale of the Defendant's Products, which were acquired through acts of unlawful, unfair, and/or fraudulent competition.

## COUNT VI
**(False Advertising Law, Calif. Business & Professions Code §§ 17500 *et seq*.)**

240.    Plaintiffs and Class Members re-allege and incorporate by reference each allegation set forth above and further allege as follows.

241.    Plaintiffs bring this Count individually and on behalf of the members of the California Sub-Class against all Defendants.

242.    Plaintiffs have standing to pursue this claim as each of them suffered injury in fact as a result of Defendants' actions as set forth herein. Specifically, Plaintiffs purchased one or more Test X180 Products in reliance upon Defendants' marketing claims prior to the filing of this action. Plaintiffs used the Products as directed, but did not know that the Products cannot work as advertised, nor provide any of the promised benefits.

243.    Defendants' business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to Bus. & Prof. Code section 17500, *et seq*., because Defendants advertised Test X180 Products in a manner that is untrue and misleading or Defendants knew was untrue or misleading, or omitted material information from their advertising which Defendants had a duty to disclose.

244. Plaintiffs and California Sub-Class Members suffered lost money or property as a result of Defendants' FAL violations because they would not have purchased Test X180 Products if they knew the truth about the products.

245. Defendants' conduct caused and continues to cause substantial injury to Plaintiffs and Class Members. Plaintiffs and Sub-class continue to be exposed to Defendants' false and/or misleading advertising every time they shop for testosterone booster and encounter Defendants' false or deceptive advertising on store shelves. Defendants' competitors will also continue to suffer from Defendants' unfair or deceptive business conduct if injunctive relief is not afforded.

246. Pursuant to Section 17535 of the Code, Plaintiffs and the California Sub-Class Members seek an order of this Court enjoining Defendants from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in the Complaint.

247. Plaintiffs and the California Sub-Class also seek an order for disgorgement and restitution of all monies from sale of Test X180 Products, which were unjustly acquired through its wrongful business practice.

## COUNT VII
### (Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*)

248. Plaintiffs and Class Members re-allege and incorporate by reference each allegation set forth above and further allege as follows.

249. Plaintiffs bring this Count individually and on behalf of the members of the California Sub-Class against all Defendants.

250. This cause of action is brought pursuant to the Consumers Legal Remedies Act (the "CLRA"), Cal. Civ. Code §§ 1750, *et seq*. Plaintiffs and California sub-class are consumers

as defined by Cal. Civ. Code § 1761(d). Test X180 Products are goods within the meaning of Cal. Civil Code § 1761(a).

251.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

252.    Defendants violated and continue to violate the CLRA by engaging in the following practices proscribed by § 1770(a), in transactions with Plaintiffs and California Sub-class which were intended to result in, and did result in, the sale of Test X180 Products:

a.      CLRA § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.      CLRA § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.      CLRA § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.      CLRA § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

253.    Defendants violated the CLRA by making false or deceptive or misleading representations about Test X180 Products as described above, when they knew, or should have known, that the representations and advertisements were false or misleading.

254.    Plaintiffs and California Sub-Class Members reasonably relied upon Defendants' representations regarding the qualities and attributes of Test X180 Products.

255.    Plaintiffs and California Sub-Class Members were deceived by Defendants' representations as to the qualities and attributes of Test X180 Products.  Plaintiffs and Sub-Class

Members would not have purchased Test X180 Products nor paid as much for them had they known the true nature of these products. Though, Plaintiffs and Sub-Class Members would still be interested in purchasing Test X180 Products in the future if these products were represented properly or truthfully.

256.    Pursuant to section 1782 *et seq.* of the CLRA, Plaintiffs notified Defendants in writing by certified mail of the particular violations of § 1770 of the Act as to Test X180 Products and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act. Defendants' wrongful business practices regarding the product constituted, and constitute, a continuing course of conduct in violation of the CLRA since Defendants are still representing that the Test X180 Products have characteristics, uses, benefits, and abilities which are false and misleading, and have injured and continue to injure Plaintiffs and the Sub-class. As a result, Plaintiffs and Sub-Class have suffered irreparable harm and seek injunctive relief under the CLRA.

257.    Because Defendant failed to implement remedial measures, Plaintiffs seek actual damages, punitive damages, and attorneys' fees and costs for their CLRA claim.

### COUNT VIII
### (Song-Beverly Consumer Warranty Act, Civil Code § 1790, *et seq.*)

258.    Plaintiffs and Class Members re-allege and incorporate by reference each allegation set forth above and further allege as follows.

259.    Plaintiffs bring this Count individually and on behalf of the members of the California Sub-Class, against all Defendants.

260.    The Product is a consumer good because it is for personal, family or household purposes, and was purchased at retail sale by Plaintiffs and the Class from Defendant. *See* Cal. Civ. Code §§ 1791, 1792.

261.    The Product is intended for human consumption.  *See Klein v. Duchess Sandwich Co.*, 14 Cal. 2d 272, 276-84, 93 P.2d 799 (1939); *Gottsdanker v. Cutter Labs.*, 182 Cal. App. 2d 602, 606-07, 6 Cal. Rptr. 320 (1960).

262.    Defendants are merchant(s) or retailer(s) with respect to the goods sold.  Cal. Civ. Code §§ 1792, 1791.1(a).

263.    Defendants warrant that Test X180 Products will (i) boost testosterone levels, (ii) boost sex drive and libido, and (iii) are effective for the Products' intended use.

264.    The warranties were breached because the Test X180 Products were not reasonably fit for the ordinary purposes for which such goods are used, or the Products did not reasonably conform to the promises or affirmations of fact on the container or label.  CACI 1230, 1231, 1232, 1233; *see also* Cal. Civ. Code §§ 1792, 1791.1(a)

265.    Defendants' breach of warranty caused Plaintiffs and Sub-class to suffer damage in the amount of the total purchase price of the Test X180 Products.

266.    In addition to compensatory damages, Cal. Civ. Code § 1794, Plaintiffs and Sub-Class are entitled to rescission, *id.* § 1794(b)(1), costs, attorneys' fees and statutory penalties, *id.* § 1794(c).

## COUNT IX
## UNJUST ENRICHMENT

267.    Plaintiffs and Class Members re-allege and incorporate by reference each allegation set forth above and further allege as follows.

268.    Plaintiffs bring this Count individually and on behalf of the members of the Nationwide Class and California Sub-Class against all Defendants.

269.    Defendant's practices described above resulted in Plaintiffs and the Class to purchase Defendants' Test X180 Products.

270.   The monies paid by Plaintiffs and the Class to Defendants conferred substantial benefits upon Defendant.

271.   Defendants knew of the benefits conferred upon them by Plaintiffs and the Class.

272.   Defendants appreciated the benefits conferred upon it by Plaintiffs and the Class.

273.   Defendants accepted the benefits conferred upon it by Plaintiffs and the Class.

274.   Defendants retained the benefits conferred upon it by Plaintiffs and the Class.

275.   By reason thereof, Defendant was unjustly enriched.

276.   Plaintiffs and the Class have sustained damages.

## <u>RELIEF DEMANDED</u>

WHEREFORE, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, prays for judgment and relief against Defendants as follows:

(a)   An order certifying this action is properly brought and may be maintained as a class action;

(b)   An order appointing Plaintiffs as class representatives of the Nationwide Class and the California Sub-Class, and Block & Leviton LLP, Law Office of Ronald A. Marron and Faruqi & Faruqi LLP as co-counsels for the Class and Sub-class;

(c)   An order requiring Defendants to bear the costs of class notice;

(d)   An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

(e)   An order awarding restitution of the purchase price of the Test X180 Products to Plaintiffs and the proposed Class Members, and restitutionary disgorgement of Defendants' revenues from all the Test X180 Product purchases made by Plaintiffs and proposed Class

Members;

(f)     An order compelling Defendants to engage in a corrective advertising campaign to inform the public concerning the true nature of the Test X180 Products, including a recall of the falsely labeled Products;

(g)     An order awarding Plaintiffs and the Class Members damages and punitive damages in the amount to be determined at trial;

(h)     An order awarding costs, expenses, and reasonable attorneys' fees; and

(i)     An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all causes of action so triable.

DATED: September 3, 2015                 Respectfully Submitted,

**BLOCK & LEVITON LLP**

/s/ Jason M. Leviton_____
JASON M. LEVITON
JOEL A. FLEMING
155 Federal Street
Boston, Massachusetts 01110
T. 617.398.5600
F. 617.507.6020
Email:  Jason@blockesq.com
            Joel@blockesq.com

**THE LAW OFFICES OF
RONALD A. MARRON**
RONALD A. MARRON (admitted *pro hac vice*)
651 Arroyo Drive
San Diego, California 92103
Telephone:     (619) 696-9006
Facsimile:     (619) 564-6665
Email:  ron@consumeradvocates.com

**FARUQI & FARUQI, LLP**
Antonio Vozzolo (admitted *pro hac vice*)
369 Lexington Avenue, 10th Floor
New York, New York 10017
Telephone: (212) 983-9330

Facsimile: (212) 983-9331
Email: avozzolo@faruqilaw.com

**Counsel for Plaintiffs and**
**the Proposed Class**